Brian DEMARIA, Individually and on behalf of all others similarly situated, Robert Brisken, Individually and on behalf of all others similarly situated, Edward Sisco, Individually and on behalf of all others similarly situated, Terry C. Whorton, Individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

William P. ANDERSEN, III, Peter W. Minford, Bruns H. Grayson, Peter C. Morse, Randall E. Poliner, ING Baring Furman Selz, LLC, Warburg Dillon Read, LLC, ILife.com, Inc., Defendants–Appellees,

KPMG, LLP, Defendant.

Docket No. 01–7505.

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 2002.

Decided Jan. 28, 2003.

I. Stephen Rabin, Rabin & Peckel LLP (Brian Murray, Rabin & Peckel LLP, Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, on the brief), New York, NY, for Plaintiffs–Appellants.

Martin I. Kaminsky, Pollack & Kaminsky (Edward T. McDermott, Justin Y.K. Chu, on the brief), New York, NY, for Defendants–Appellees ILife.com, Andersen, Minford, Grayson, Morse, and Poliner.

Jay B. Kasner, Skadden, Arps, Slate, Meagher & Flom LLP (Darren E. Bernstein, on the brief), New York, NY, for Defendants–Appellees ING Baring Fur-

man Selz, LLC and Warburg Dillon Read, LLC.

David M. Becker, General Counsel, Securities and Exchange Commission (Meyer Eisenberg, Deputy General Counsel, Eric Summergrad, Deputy Solicitor, Allan A. Capute, Special Counsel to the Solicitor, on the brief), Washington, DC, as amicus curiae.

Before: JOHN M. WALKER, Jr., Chief Judge, F.I. PARKER and SOTOMAYOR, Circuit Judges.

JOHN M. WALKER, Jr., Chief Judge.

Plaintiffs-appellants appeal from a judgment of the United States District Court for the Southern District of New York (William H. Pauley, III, *District Judge*), dismissing plaintiffs' securities class action complaint pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiffs' claims arise out of a May 1999 initial public offering ("IPO") for shares of ILife.com, Inc. ("ILife"),[1] an internet start-up company. Finding that plaintiffs had failed to state a claim upon which relief could be granted, the district court dismissed plaintiffs' class action complaint. *See DeMaria v. Andersen,* 153 F.Supp.2d 300, 314 (S.D.N.Y.2001). Finding no error in the district court's judgment, we affirm.

## BACKGROUND

Defendant ILife produces, syndicates, and publishes personal finance information over the internet. Plaintiffs' securities class action arises from an initial public offering ("IPO") conducted by ILife in May 1999. In their amended complaint, plaintiffs allege, *inter alia,* that the prospectus ILife filed with the Securities and Exchange Commission ("SEC") contained inaccurate information. As a consequence, plaintiffs assert, the securities sold in the IPO were unregistered, in violation of Sections 12(a)(1) and 5 of the Securities Act of 1933 (the "1933 Act"). In addition, plaintiffs claim that ILife's failure to disclose certain financial information rendered the registration statement false and misleading in violation of Section 11 of the 1933 Act. Plaintiffs' complaint named ILife and five of its officers/directors who signed the registration statement. *Id.* at 303. Plaintiffs also named the two lead underwriters of the IPO, ING Baring Furman Selz, LLC and Warburg Dillon Read, LLC (collectively, the "underwriter defendants").

In March 1999, in anticipation of the IPO, ILife electronically filed with the SEC a registration statement together with the prospectus now being challenged, via the SEC's Electronic Data Gathering, Analysis and Retrieval System ("EDGAR"), as required by SEC regulation. *See* 17 C.F.R. §§ 232.101, 232.102.[2] The SEC declared the registration statement effective for an IPO of 3,500,000 shares of ILife stock at $13 per share.

In addition to filing the prospectus electronically (the "EDGAR Prospectus"), ILife distributed a printed version to the public (the "Printed Prospectus"). Due to an unexplained and seemingly inadvertent error, the EDGAR Prospectus inaccurately summarized a bar graph that appeared in the Printed Prospectus. The bar graph in the Printed Prospectus reported both on-line publishing revenue and net losses, whereas the EDGAR Prospectus contained a table that incorrectly identified ILife's on-line publishing net losses as publishing revenue and made no mention of net loss-

---

**1.** ILife.com is now known as Bankrate, Inc., but the change in name is immaterial to this appeal.

**2.** All references to SEC regulations are to the versions that were in effect in March 1999, when ILife filed its registration statement.

es. *See DeMaria*, 153 F.Supp.2d at 303–04.

On May 18, 1999, three days after the registration statement became effective, ILife's stock closed at $10.50 per share, down from the $13 offering price. On May 24, eleven days after the IPO, ILife announced its first quarter results for 1999, indicating that it had suffered a $6 million loss on revenue of $2.2 million (including on-line publishing revenue of $1.369 million). Plaintiffs assert that immediately following this announcement, ILife's stock slipped to $10 per share, that the stock was down to $8.19 by May 27, and that the stock was trading at approximately $0.67 per share by August 1999, the time this appeal was briefed.

The discrepancy between the EDGAR Prospectus and the Printed Prospectus forms the basis of plaintiffs' first claim: they contend that the shares issued in the IPO were unregistered securities sold in violation of the 1933 Act because they were sold pursuant to the Printed Prospectus, not the version of the prospectus filed with the SEC. As mentioned above, plaintiffs also claim that the registration statement was materially false and misleading, in violation of Section 11 of the 1933 Act, due to ILife's failure to include financial information for the quarter ending March 31, 1999.

The district court rejected plaintiffs' claim that the securities were unregistered and concluded that the registration statement was not materially false and misleading. *DeMaria*, 153 F.Supp.2d at 308, 311–12. Consequently, the district court dismissed all of plaintiffs' claims under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. *Id.* at 314. This appeal followed.

Because of the novelty and importance of the issues raised in this appeal, we requested and received briefing from the SEC as *amicus curiae* on a number of discrete questions after oral argument.

## DISCUSSION

We review *de novo* the district court's dismissal of a complaint for failure to state a claim. *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir.2002). In doing so, "[w]e must accept as true the allegations contained in the complaint, and all reasonable inferences must be drawn in favor of the non-movant." *Bd. of Educ. of the Pawling Cent. Sch. Dist. v. Schutz*, 290 F.3d 476, 479 (2d Cir.2002).

On appeal, plaintiffs argue that the district court erred (1) in dismissing their Section 12(a)(1) claim; (2) in ruling that ILife's prospectus was not materially false and misleading; and (3) by denying plaintiffs leave to amend in order to add another defendant, Morgan Stanley, one of the underwriters of the IPO. We address each of these arguments in turn.

*I. Section 12 Claim*

Section 12 of the 1933 Act provides that "[a]ny person who ... (1) offers or sells a security in violation of [Section 5 of the 1933 Act] ... shall be liable ... to the person purchasing such security from him." 15 U.S.C. § 77l(a) (" § 12(a)(1)"). Section 5, in turn, states that "[u]nless a registration statement is in effect as to a security, it shall be unlawful" to sell or carry such security through interstate commerce or the mails. *Id.* § 77e(a) (" § 5").[3]

---

**3.** As an initial matter, we note that although the district court analyzed this issue as implicating plaintiffs' standing to bring suit, we find that plaintiffs have " 'alleged such a personal stake in the outcome of the controversy' as to warrant [their] invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343

[redacted] In this case, plaintiffs' § 12(a)(1) claim is based on the theory that due to the error in the EDGAR Prospectus, the shares sold in the ILife IPO were unregistered, in violation of § 5. As noted earlier, ILife's Printed Prospectus contained a bar graph that provided historical financial information, while the EDGAR Prospectus contained a table that summarized the bar graph inaccurately. Plaintiffs contend that "[t]here is no compliance with Section 5 when the prospectus which is distributed to the public is not the same prospectus which has been declared effective by the SEC." Arguing that the shares sold in the ILife IPO were sold pursuant to the Printed Prospectus, rather than the EDGAR Prospectus declared effective by the SEC, plaintiffs claim a violation of § 5 and seek rescission damages under § 12(a)(1).

We reject plaintiffs' argument because it rests on an erroneous interpretation of the regulations pertaining to SEC filings. Title 17 C.F.R. § 232.304 ("Rule 304") provides the rules and regulations for preparing EDGAR filings that include graphic, image or audio material as follows:

> (a) If a filer includes graphic, image or audio material in a document delivered to investors and others that cannot be reproduced in an electronic filing, the electronically filed version of that document shall include a fair and accurate narrative description, tabular representation or transcript of the omitted material....
>
> (b)(1) The graphic, image and audio material in the version of a document delivered to investors and others shall be deemed part of the electronic filing and subject to the liability and anti-fraud provisions of the federal securities laws.
>
> (2) Narrative descriptions, tabular representations or transcripts of graphic, image and audio material included in an electronic filing or appendix thereto also shall be deemed part of the filing. However, to the extent such descriptions, representations or transcripts represent a good faith effort to fairly and accurately describe omitted graphic, image or audio material, they shall not be subject to the liability and anti-fraud provisions of the federal securities laws.

17 C.F.R. § 232.304.

Applying Rule 304, the district court rejected plaintiffs' argument that the EDGAR Prospectus and Printed Prospectus are materially different on the ground that the graphic material included in the Printed Prospectus is "deemed part of the Registration Statement filed with, and declared effective by, the SEC." *DeMaria,* 153 F.Supp.2d at 308 (internal quotation marks omitted). The district court concluded that, "[a]s a result, there is no cognizable claim that the registration of ILife shares was defective and that ILife shares were sold in contravention of Section 5. Therefore, there is no violation of Section 12(a)(1)." *Id.* Plaintiffs contend that the district court's interpretation of the rule is erroneous because subsection (b) of Rule 304 is applicable only "*if* and *when* Rule 304(a) has been satisfied."

In its amicus brief, the SEC asserts that

> [t]he "fair and accurate" requirement of Section 304(a) is not a precondition to a Printed Prospectus being "deemed part of" the EDGAR registration statement under Rule 304(b)(1). The two subsections operate independently, and nothing in the rule makes compliance with Section 304(a) a predicate condition to Section 304(b)(1).

(1975) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). We agree, however, with the district court that plaintiffs' allegations brought under § 12(a)(1) fail to state a claim upon which relief can be granted.

SEC Br. at 8. Subsection (b) not only provides that the graphic, image and audio material is "deemed part of the electronic filing," but also establishes that these materials are "subject to the liability and anti-fraud provisions of the federal securities laws." 17 C.F.R. § 232.304(b)(1). Accordingly, as the SEC explains, the purpose of Rule 304(b) is simply "to assure that the graphic material is subject to civil liability that relates to false or misleading statements in the registration statement." SEC Br. at 9. In light of this purpose, plaintiffs' assertion that Rule 304(b) liability is contingent upon satisfaction of Rule 304(a)'s "fair and accurate" requirement makes no sense. *Id.*

■ We are "bound by the SEC's interpretations of its regulations in its *amicus* brief, unless they are 'plainly erroneous or inconsistent with the regulation[s].'" *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128 (2d Cir.2000) (quoting *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)) (alteration in original); *see also Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir.2001), *cert. denied*, 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002). Because that deferential standard is easily met here, we adopt the SEC's position, which is dispositive of plaintiffs' § 12(a)(1) claim. Accordingly, we hold that the district court was correct in considering the graphic material contained in the Printed Prospectus to be part of the EDGAR Prospectus and registration statement in determining whether the ILife securities were unregistered and sold in violation of the 1933 Act. In a case such as this one, where the only claimed error in an electronically filed prospectus is an inaccurate summary of the graphic, audio, or visual material contained in the Printed Prospectus, "the printed prospectus conforms to the registration statement ..., and its distribution to investors cannot form the basis for a claim under Sec-

tion 12(a)(1)." SEC Br. at 10. We thus affirm the district court's dismissal of plaintiffs' § 12(a)(1) claim.

## II. Section 11 Claim

Section 11 of the 1933 Act provides in pertinent part

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may ... sue [enumerated persons and entities].

15 U.S.C. § 77k(a) ("§ 11"). Plaintiffs allege that ILife's failure to disclose interim financial information for the first quarter of 1999 in its prospectus rendered it materially misleading.

### A. Section 11 Standing

■ The underwriter defendants contend that because plaintiffs purchased their ILife shares in the aftermarket, not pursuant to the IPO, they lack standing to bring suit under § 11. As noted, § 11 provides a cause of action for "any person acquiring" a security issued pursuant to a materially false registration statement unless the purchaser knew about the false statement at the time of acquisition. *Id.* The underwriter defendants argue that the statutory scheme, legislative history, and the Supreme Court's reasoning in *Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), all dictate that only persons who purchased shares in the IPO have standing to sue under § 11. We disagree.

In evaluating whether plaintiffs have standing, we first turn to the language and

structure of the statute. *See In re Edelman,* 295 F.3d 171, 177 (2d Cir.2002) ("When interpreting the meaning of a statute . . . the starting point of inquiry is of course the language of the statute itself."); *accord Senator Linie Gmbh & Co. v. Sunway Line, Inc.,* 291 F.3d 145, 154 (2d Cir.2002). As set forth above, § 11 expressly states that "any person acquiring such security . . . may . . . sue." 15 U.S.C. § 77k(a).

The plain meaning of this provision is clear. The common word "any" may mean "one or another," "one, some or all," or "every." Webster's Third New International Dictionary 97 (1981). We can find no reason why "any" as used in § 11 should not be read as the equivalent of "every" such that every person who acquires a security issued pursuant to an allegedly defective registration statement has standing to sue under § 11. As the Eighth Circuit recently held, "we read § 11's plain language to state unambiguously that a cause of action exists for any person who purchased a security that was originally registered under the allegedly defective registration statement—so long as the security was indeed issued under *that* registration statement and not another." *Lee v. Ernst & Young, LLP,* 294 F.3d 969, 976–77 (8th Cir.2002); *see also Joseph v. Q.T. Wiles,* 223 F.3d 1155, 1159 (10th Cir.2000) ("[T]he natural reading of 'any person acquiring such security' is simply that the buyer must have purchased a security issued under the registration statement at issue, rather than some other registration statement.").

This understanding of the statutory text conforms with the long-standing practice in this circuit of permitting suit under § 11 by those who can "trace" their shares to

the allegedly defective registration statement. *See Barnes v. Osofsky,* 373 F.2d 269, 271 (2d Cir.1967) (assuming that an action under § 11 may be maintained by "those who purchase securities that are the direct subject of the prospectus and registration statement") (internal quotation marks omitted); *see also Lee,* 294 F.3d at 978 (holding that standing under § 11 exists for those who can make a prima facie showing that the shares they purchased "can be traced to the registration statement alleged to be false and misleading"); *Joseph,* 223 F.3d at 1159–60 (same); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1080 (9th Cir.1999) (same). In a case such as this one, where there has been only one stock offering, any person who acquires the security may sue under § 11, "regardless of whether he bought in the initial offering, a week later, or a month after that." *Hertzberg,* 191 F.3d at 1080.

Other provisions of § 11 in addition to its plain meaning support our conclusion that aftermarket purchasers have standing to sue under the section. *See generally K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). Looking at § 11 as a whole, there are at least three additional subsections that compel this result.

First, § 11(a) provides that a purchaser who acquires the security more than twelve months after the issuance of the original registration statement must prove reliance on the registration statement in order to recover. 15 U.S.C. § 77k(a).[4] By

---

4. The pertinent language from § 11(a) is as follows:

If such person acquired the security after the issuer has made generally available to its security holders an earning statement

affording a right of recovery to those who purchased the stock more than twelve months after the issuance of the initial registration statement, Congress plainly contemplated suit under § 11 by shareholders who did not purchase the security in the initial offering.

In addition, subsections (e) and (g) of § 11 limit the damages that may be recovered to "the price at which the security was offered to the public." *Id.* § 77k(e)-(g). This express limitation on the recoverable damages would be redundant if only those who had purchased in the offering (*i.e.*, at the initial offering price) could recover, because their potential damages would be limited in any event to the price they had paid in the offering. *See Lee,* 294 F.3d at 977 (noting that subsections (e) and (g) would be rendered unnecessary if the only plaintiffs with standing to sue were participants in the IPO); *accord Joseph,* 223 F.3d at 1159; *Hertzberg,* 191 F.3d at 1080. To conclude that aftermarket purchasers did not have a right of recovery under § 11 would render these provisions superfluous, violating a basic tenet of statutory interpretation. *See Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior,* 228 F.3d 82, 88 (2d Cir. 2000) ("[W]e are required to 'disfavor interpretations of statutes that render language superfluous.'" (quoting *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992))), *cert. denied,* 532 U.S. 1007, 121 S.Ct. 1732, 149 L.Ed.2d 657 (2001).

In support of their contention that aftermarket purchasers lack standing under § 11, the underwriter defendants rely principally on *Gustafson,* in which the Su-

preme Court surveyed the history of the 1933 Act and reiterated its observation that "[t]he 1933 Act is a far narrower statute [than the Securities Exchange Act of 1934; it is] chiefly concerned with disclosure and fraud in connection with offerings of securities—primarily, as here, initial distributions of newly issued stock from corporate issuers." *Gustafson,* 513 U.S. at 572, 115 S.Ct. 1061 (internal quotation marks omitted). Defendants argue that this reasoning applies to § 11 such that only purchasers of newly issued stock may bring suit, not purchasers of securities already in the marketplace.

Defendant's reliance on *Gustafson* and the legislative history of the 1933 Act is misplaced. As we have often stated, "[w]here the statutory terms are clear, our inquiry is at an end." *In re Edelman,* 295 F.3d at 177; *accord Conn. Nat'l Bank,* 503 U.S. at 253–54, 112 S.Ct. 1146. As discussed above, the phrase "any person acquiring such security" is plain on its face. Thus, we have no need to turn to extrinsic sources to determine § 11's meaning.

In any event, *Gustafson* emphasizes that the 1933 Act was concerned primarily with regulating public offerings. *Gustafson,* 513 U.S. at 572, 115 S.Ct. 1061. Allowing suit by aftermarket purchasers of shares issued in a public offering does not conflict with this goal because the focus of the claim remains on deceptions occurring during the public offering.

Moreover, *Gustafson* involved § 12 of the 1933 Act, not § 11. *Gustafson,* 513 U.S. at 564, 115 S.Ct. 1061. Because "the wording of the two provisions is distinctly different," *Joseph,* 223 F.3d at 1161; *see also Lee,* 294 F.3d at 976 (same); *Hertz-*

---

covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission . . . .

15 U.S.C. § 77k(a).

*berg,* 191 F.3d at 1081 (same), we find the specific teachings of *Gustafson* with respect to who may sue to be inapplicable. As discussed above, § 11 expressly provides a remedy for "any person" who acquires a security issued pursuant to a registration statement that contains an untrue statement of material fact or omits to state a material fact. 15 U.S.C. § 77k. In contrast, § 12 establishes liability on the part of a seller "to the person purchasing such security from him." 15 U.S.C. § 77*l* (a). Thus, the requirement of privity between the purchaser and seller stems not from the goals of the 1933 Act as enunciated in *Gustafson,* but from the specific language of § 12. *See Joseph,* 223 F.3d at 1161; *see also Lee,* 294 F.3d at 976.

Based on the foregoing reasons, all three circuits that have examined the question since *Gustafson* have determined that aftermarket purchasers may sue under § 11. *See Lee,* 294 F.3d at 976–78; *Joseph,* 223 F.3d at 1159 ("[W]e conclude that an aftermarket purchaser has standing to pursue a claim under section 11 so long as he can prove the securities he bought were those sold in an offering covered by the false registration statement."); *Hertzberg,* 191 F.3d at 1080.[5] This conclusion conforms to decisions prior to *Gustafson* that held that those who may trace their shares to the allegedly faulty registration statement may sue under § 11. *See, e.g., Versyss Inc. v. Coopers & Lybrand,* 982 F.2d 653, 657–58 (1st Cir.1992); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 286 (3d Cir.1992); *Barnes,* 373 F.2d at 273 & n. 2.

■ In line with these decisions, we hold that aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act. *See Barnes,* 373 F.2d at 272 (noting that the penalties imposed by § 11 "are to insure full and accurate disclosure through registration"). We thus affirm the district court's ruling that plaintiffs have standing to sue under § 11. *See DeMaria,* 153 F.Supp.2d at 309–10.

## B. Section 11 Liability

On the merits, plaintiffs maintain that § 11 imposed on ILife a duty to disclose interim financial results for the quarter ending March 31, 1999 in order to make the statements in the March 1999 registration statement not materially misleading. Specifically, plaintiffs allege in their complaint that (a) the prospectus, while reporting that ILife had enjoyed a trend of steady revenue growth of at least 25% per quarter, failed to disclose that ILife's revenue growth dropped to 10% in the first quarter of 1999; and (b) the prospectus was misleading as to ILife's net losses, in part because it failed to disclose a $6,000,000 loss incurred in the first quarter of 1999.

The district court rejected plaintiffs' claims and concluded that "the Registration Statement was not materially false or misleading and the omissions identified in the amended complaint were in fact adequately disclosed." *DeMaria,* 153

---

5. The weight of the academic literature also supports the conclusion that § 11 should be interpreted to permit suit by aftermarket purchasers. *See, e.g.,* Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corp. Law,* § 12:30 (2nd ed. 1998) ("Any purchasers of the security covered by the registration statement can bring an action under Section 11. This includes persons who purchased securities in the trading market rather than in the original issue . . . ."); *see also* 24 William M. Prifti, *Securities: Public and Private Offerings* § 12:5 & nn.22–24(2002) (same); 1 Thomas Lee Hazen, *Law of Securities Regulation* § 7.3[2] (4th ed. & 2002 Pocket Part) (same); Robert A. Fippinger, *Securities Law of Public Finance* § 7:6.1 (Release 8 2001) (same).

F.Supp.2d at 311. We agree, although our reasoning is somewhat different.

In assessing plaintiffs' claims, we must first determine which disclosures to analyze: the EDGAR Prospectus, the Printed Prospectus, or both. The district court, after concluding that the Printed Prospectus was "deemed part of" the EDGAR Prospectus, focused primarily on the Printed Prospectus. In doing so, however, the district court conflated the issue of whether the EDGAR Prospectus was registered for purposes of §§ 5 and 12 with the issue of whether ILife's disclosures in the IPO were materially false and misleading for purposes of § 11. As the SEC noted in its *amicus curiae* brief, "the mere fact that the printed prospectus is deemed part of the registration statement," thus foreclosing § 12 liability, does not necessarily "insulate[ ] the defendants from Section 11 liability." SEC Br. at 16–17. We agree.

█ The situation in this case is similar to one in which a disclosure contains both accurate and inaccurate information. Under such circumstances, the Supreme Court has cautioned that "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S.Ct. 2749,

115 L.Ed.2d 929 (1991). Because we cannot reasonably expect an investor to read more than one version of a company's prospectus, we agree with the SEC that liability under § 11 may lie either where one version of a prospectus is materially misleading or where different versions of a prospectus, taken together, are materially misleading.[6] The only alleged or apparent differences between the Printed Prospectus and the EDGAR Prospectus are the discrepancies between the bar graph and the chart to which we have referred. As a result of these discrepancies, the EDGAR Prospectus contains less accurate information than the Printed Prospectus does. We therefore consider only whether the EDGAR Prospectus was materially misleading alone or when read in conjunction with the Printed Prospectus: If neither the EDGAR Prospectus alone nor the two prospectuses read together is misleading, *a fortiori*, the Printed Prospectus alone is not materially misleading.

### 1. Duty to Disclose Interim Financial Information

In response to plaintiffs' argument that ILife was under a duty to disclose the March 1999 financials in the prospectus, defendants maintain that they are insulated from potential liability because they complied with SEC Regulation S–X, 17 C.F.R. § 210, which sets forth the financial information that must be disclosed in a registration statement.[7] The district court

---

**6.** We note, however, that in the event that a discrepancy between a printed and electronic prospectus arises out of a good faith effort to describe graphic, image or audio material, Rule 304(b)(2) may nevertheless preclude liability under § 11. *See* 17 C.F.R. § 232.304(b)(2) ("[T]o the extent ... descriptions, representations or transcripts [of graphic, image or audio material included in an electronic filing] represent a good faith effort to fairly and accurately describe omitted graphic, image or audio material, they shall

not be subject to the liability and anti-fraud provisions of the federal securities laws."). Given our conclusion, *infra,* that ILife's registration statement and prospectuses were not materially misleading, we need not reach the question of whether this safe harbor provision applies in this case.

**7.** Regulation S–X provides, in pertinent part, as follows:

If the financial statements in a filing are as of a date 135 days or more prior to the date

agreed with the defendants, relying on *In re N2K Inc. Secs. Litig.*, which stated that "[t]he relevant SEC regulations answer the question as to what material facts are required to be stated in an issuer's registration statement and prospectus." 82 F.Supp.2d 204, 207 (S.D.N.Y.), *aff'd on the district court opinion*, 202 F.3d 81 (2d Cir.2000) (*per curiam*).

Although Regulation S–X specifically sets forth circumstances under which stale financial information must be updated with interim data, *see* 17 C.F.R. § 210.3–12, it is not the only operative SEC regulation. The SEC's general regulations expressly provide that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408. *See In re N2K*, 82 F.Supp.2d at 207–08 (discussing Rule 408).

■ Accordingly, in evaluating whether defendants were under a duty to disclose interim financial information in the prospectus, we must determine whether the March 1999 information was material in light of the financial information already disclosed to investors. To do so, we engage in the familiar inquiry of whether there is "a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *see Press*, 218 F.3d at 130; *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106–07 (2d Cir.1998).

In evaluating a prospectus, we read it "as a whole." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996); *see also In re N2K*, 82 F.Supp.2d at 209. Our inquiry does not focus on whether "particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities]." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). As we have explained, "[a] prospectus will violate federal securities laws if it does not disclose 'material objective factual matters,' or buries those matters beneath other information, or treats them cavalierly." *Olkey*, 98 F.3d at 5 (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991)).

Plaintiffs' first contention—that the prospectus was misleading with respect to ILife's revenue growth—is without merit. Plaintiffs allege that the prospectus reported promising revenue growth of no less than 25% per quarter and that the March 1999 data indicated a dramatic reversal of this trend. As the district court succinctly observed, "this is demonstrably untrue." *DeMaria*, 153 F.Supp.2d at 312. In fact,

the quarterly 1998 net revenues disclosed in the [EDGAR] Prospectus show an increase of 2[7]% from $9[5]0,000 for the first quarter ended March 31, 1998 to $1,203,000 for the second quarter ended June 30, 1998; a 3[2]% increase to $1,583,000 for the third quarter ended September 30, 1998; and a 19% increase

---

the filing is expected to become effective ..., the financial statements shall be updated ... with a balance sheet as of an interim date within 135 days and with statements of income and cash flows for the interim period between the end of the most recent fiscal year and the date of the interim balance sheet provided and for the corresponding period of the preceding fiscal year.

17 C.F.R. § 210.3–12.

to $1,886,000 for the fourth quarter ended December 31, 1998. Only by improperly rounding the quarterly figures do plaintiffs manufacture the theory of 25% quarter-to-quarter revenue growth.

Moreover, ILife's reported first quarter 1999 revenues of $2,226,000 reflect an 18% increase from the prior quarter and a 134% increase from the corresponding period of the prior year. Thus, not only was there no trend of 25% growth, there was no reversal of a growth trend.

*DeMaria,* 153 F.Supp.2d at 312. We agree with the district court that ILife's failure to include revenue information for the March 1999 quarter did not render the prospectus materially misleading.

In addition, insofar as liability might be based on the incorrect publishing revenue data included in the EDGAR Prospectus, we conclude that the erroneous information would not have misled the average investor in light of the accurate information contained in the prospectus. The chart that inaccurately summarized "Publishing Revenue" in the EDGAR Prospectus was actually cured by the accurate disclosure of publishing revenue and complete financial tables that were contained later in the EDGAR Prospectus. As plaintiffs acknowledge in their brief, the disparity between the "Publishing Revenue" figures contained in the inaccurate table and the "Publishing and Licensing Revenue" reported later in the prospectus was apparent on the face of the prospectus. In fact, the figures identified as "Publishing Revenue" in the table *understated* the total revenues for publishing and licensing revenues. A reasonable investor would have either noticed the discrepancy and relied upon the detailed financial data included later in the EDGAR Prospectus or believed that ILife's publishing revenue was *less* than it actually was. Under either interpretation, the erroneous table in

the EDGAR Prospectus would not have caused a reasonable investor to overestimate ILife's past performance or future performance potential.

In short, we conclude that, reading the prospectus as a whole, ILife's failure to include the first quarter March 1999 financial figures would not have misled a reasonable investor as to ILife's revenue potential.

2.  Disclosure of Losses

■ We likewise reject plaintiffs' claim that the prospectus failed to adequately disclose ILife's losses, including its ratio of net loss as a percentage of revenue and its net loss of $6 million in the March 1999 quarter. Specifically, plaintiffs assert that the prospectus suggested that the ratio of net losses to revenues was declining when in fact ILife's net loss as a percentage of revenues jumped to 270% in the March 1999 quarter. However, the EDGAR Prospectus explicitly disclosed net loss information for every quarter through the end of 1998 and stated an expectation of substantial future losses, including non-cash compensation expenses totaling $1,893,000 and a non-cash financing charge of $2,656,000 for the first quarter of 1999.

In addition, the prospectus plainly stated that ILife had a history of net losses and that ILife

> anticipate[s] that [it] may incur operating losses in the future due to a high level of planned expenditures. Furthermore, [ILife] will incur significant non-cash charges during the next four years. Although [ILife's] revenue has grown rapidly in recent periods, such growth may not continue and may not lead to profitability.

In light of these cautionary statements and the specific, prominent disclosures in the EDGAR Prospectus of more than $4.5 million in losses in the quarter ending March 1999, the statements in the prospectus do

not paint an unrealistically optimistic picture of ILife's future performance but instead "bespeak caution." *I. Meyer Pincus,* 936 F.2d at 763; *see Olkey,* 98 F.3d at 5 (rejecting securities claim where disclosures "bespeak caution" and "[t]he prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed"). Indeed, the prospectus warns investors that

> period-to-period comparisons of [ILife's] results of operations may not be meaningful, and you should not rely on past periods as indicators of future performance. In future periods, [ILife's] results of operations may fall below the expectations of securities analysts and investors, which could adversely affect the trading price of the common stock. [ILife's] stock price may be volatile in the future.

As with the securities at issue in *In re N2K,*

> [i]t can hardly be said that, by having not been explicitly told of the company's actual first quarter losses, a reasonable investor would have been misled about the nature of [ILife's] securities. [ILife's] prospectus is replete with warnings and explanations of risks associated with the company's past financial history and future expectations.

*In re N2K,* 82 F.Supp.2d at 209.

The Printed Prospectus sets forth even more explicit information regarding the first quarter March 1999 net losses because it also included the on-line publishing net-loss figure of $1,478,000, bringing the total net losses disclosed for that quarter to just above $6 million. *Cf. Field v. Trump,* 850 F.2d 938, 949 (2d Cir.1988) (finding that "failure to perform [an easy] calculation for investors" did not "significantly alter[ ] the 'total mix' of information available" (internal quotation marks omitted)). In addition, given that the Printed Prospectus disclosed even more information than the EDGAR Prospectus and that a side-to-side comparison of the two prospectuses would have revealed the error in the chart, we conclude that the two prospectuses, taken together, would not have been misleading or confusing. We thus agree with the district court that the losses and risks alleged by plaintiffs were in fact adequately disclosed.

In sum, we conclude that ILife's EDGAR Prospectus and the two prospectuses taken together would not have misled a reasonable investor as to the true nature of the ILife securities and that the district court was correct to dismiss plaintiff's § 11 claim. *See Olkey,* 98 F.3d at 5; *McMahan,* 900 F.2d at 579.

### III. Leave to Amend

Finally, plaintiffs contend that the district court erred when it denied them leave to amend their complaint to add Morgan Stanley, one of the underwriters of the IPO, as a defendant with respect to their § 12(a)(1) claim. *See DeMaria,* 153 F.Supp.2d at 308 (discussing absence of Morgan Stanley as a defendant). Because, like the district court, we conclude that plaintiffs' allegations under § 12(a)(1) failed to state a claim upon which relief could be granted, we agree with the district court that amendment of the complaint would have been futile. *See id.; Kropelnicki v. Siegel,* 290 F.3d 118, 130 (2d Cir.2002) ("While generally leave to amend should be freely granted, it may be denied when there is a good reason to do so, such as futility, bad faith, or undue delay.") (internal citation omitted).

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.