**16-65-cv**
*Stadnick v. Vivint Solar, Inc., et al.*

# In the

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2016

ARGUED: AUGUST 25, 2016
DECIDED: JUNE 21, 2017

No. 16-65-cv

ROBBY SHAWN STADNICK, individually and on behalf of all others similarly situated,
*Plaintiff-Appellant,*

BRENNEN HYATT,
*Plaintiff,*

*v.*

THOMAS LIMA, individually and on behalf of all others similarly situated,
*Consolidated Plaintiff,*

*v.*

VIVINT SOLAR, INC., THE BLACKSTONE GROUP L.P., GREGORY S. BUTTERFIELD, DANA C. RUSSELL, DAVID F. D'ALESSANDRO, ALEX J. DUNN, BRUCE MCEVOY, TODD R. PEDERSEN, JOSEPH F. TRUSTEY, PETER F. WALLACE, JOSEPH S. TIBBETTS, GOLDMAN, SACHS & CO., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE

BANK SECURITIES INC., MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., BLACKSTONE ADVISORY PARTNERS L.P., *Defendants-Appellees.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 14 Cv. 9283 – Katherine B. Forrest, *District Judge.*

————

Before: WALKER, CABRANES, and LOHIER, *Circuit Judges.*

————

Plaintiff-Appellant Robby Shawn Stadnick appeals from a judgment of the United States District Court for the Southern District of New York (Forrest, *J.*) dismissing his securities class action complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Stadnick's claims arise out of the October 1, 2014 Initial Public Offering ("IPO") for shares of Vivint Solar, Inc., a residential solar energy unit installer. Stadnick principally argues on appeal that Vivint was obligated to disclose financial information for the quarter ending one day before the IPO because Vivint's performance during that quarter constituted an "extreme departure" under *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996). He also argues that Vivint misled prospective shareholders regarding the company's opportunities for expansion in Hawaii by failing to disclose the potential impact of the state's evolving regulatory regime. We conclude that the "extreme departure" test of *Shaw* is not

the law of this Circuit and that Vivint's omissions were not material under the test set forth in *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003), to which we adhere. We further conclude that Vivint did not mislead shareholders regarding the company's prospects in Hawaii. We therefore AFFIRM the judgment of the district court.

_____

NICHOLAS IAN PORRITT (Adam M. Apton *on the brief*), Levi & Korsinsky LLP, Washington, DC, *for Plaintiff-Appellant*.

JAY B. KASNER (Scott D. Musoff *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for Defendants-Appellees* Vivint Solar, Inc., The Blackstone Group L.P., Gregory S. Butterfield, Dana C. Russell, David F. D'Alessandro, Alex J. Dunn, Bruce McEvoy, Todd R. Pedersen, Joseph F. Trustey, Peter F. Wallace & Joseph S. Tibbetts.

Paul Vizcarrondo, Jr., Carrie M. Reilly & Steven Winter *on the brief*, Wachtell, Lipton, Rosen & Katz, New York, NY, *for Defendants-Appellees* Goldman, Sachs & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Morgan Stanley & Co. LLC, Barclays Capital Inc. & Blackstone Advisory Partners L.P.

_____

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiff-Appellant Robby Shawn Stadnick appeals from a judgment of the United States District Court for the Southern District of New York (Forrest, *J.*) dismissing his securities class action complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Stadnick's claims arise out of the October 1, 2014 Initial Public Offering ("IPO") for shares of Vivint Solar, Inc., a residential solar energy unit installer. Stadnick principally argues on appeal that Vivint was obligated to disclose financial information for the quarter ending one day before the IPO because Vivint's performance during that quarter constituted an "extreme departure" under *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996). He also argues that Vivint misled prospective shareholders regarding the company's opportunities for expansion in Hawaii by failing to disclose the potential impact of the state's evolving regulatory regime. We conclude that the "extreme departure" test of *Shaw* is not the law of this Circuit and that Vivint's omissions were not material under the test set forth in *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003), to which we adhere. We further conclude that Vivint did not mislead shareholders regarding the company's prospects in Hawaii. We therefore AFFIRM the judgment of the district court.

# BACKGROUND

For purposes of this appeal we must accept the facts as they are alleged in the complaint and draw all reasonable inferences in Stadnick's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stadnick argues, in essence, that the registration statement Vivint issued in conjunction with its IPO misled prospective shareholders.

Defendant-Appellee Vivint Solar is a residential solar energy unit installer that leases solar energy systems to homeowners.[1] During the relevant period, Vivint was the second largest installer of solar energy systems in the U.S. residential market, with approximately an 8% market share in 2013 and a 9% share in the first quarter of 2014. Vivint operated in a number of states, but as of June 30, 2014 more than 50% of its installations were in California and 15% in Hawaii. Twenty-one of its thirty-seven offices were located in those two states.

Vivint's business model is predicated upon its continued ownership of the solar energy equipment it installs, which allows Vivint to qualify for various tax credits and other government incentives. Customers pay no up-front costs and instead enter into

---

[1] The individual defendants are: Gregory S. Butterfield, at the time of Vivint's IPO the CEO, President, and a director of Vivint; Dana C. Russell, Vivint's CFO at the time of the IPO; and the remaining Vivint directors at the time of the IPO. The complaint also names the following underwriter defendants: Goldman, Sachs & Co.; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Credit Suisse Securities (USA) LLC; Citigroup Global Markets Inc.; Deutsche Bank Securities Inc.; Morgan Stanley & Co. LLC; Barclays Capital Inc.; and Blackstone Advisory Partners L.P.

twenty-year leases by which they purchase solar energy in monthly payments at approximately 15% to 30% less than they would pay for utility-generated electricity. These monthly payments are Vivint's primary revenue stream. Because Vivint incurs significant up-front costs, it has operated at a loss from its inception.

To fund its operations, Vivint secures financing from outside investors. Pursuant to contractual arrangements, these outside investors periodically make cash contributions into investment funds jointly owned by the investors and Vivint. Each investment fund then finances Vivint's purchase and installation of a particular tranche of solar energy systems. Once a system is installed, its title is transferred to the fund that contributed the capital, which allows the fund to benefit from the relevant tax credits. The fund also receives most of the customer's monthly payments until either the fund achieves a targeted rate of return or the recapture period associated with certain tax credits expires. At that time, Vivint begins to receive a majority of the revenues.

Given the investment funds' role, Vivint allocates its income between (i) its public shareholders and (ii) the outside investors, the latter of whom  Vivint refers to variously as non-controlling interests or redeemable non-controlling interests ("NCIs"). Vivint thus calculates the income available to public shareholders by first

determining the company's overall income and then subtracting the portion allocated to NCIs.

Vivint utilizes an equity accounting method known as Hypothetical Liquidation at Book Value ("HLBV"). Under HLBV, the value of an individual's portion of a business is determined by hypothetically liquidating the business at book value, *i.e.*, the value at which its assets are carried on a balance sheet. If the calculation is performed at the end of two successive quarters, the difference in the amount an individual would receive from the first quarter to the second represents his or her net gain or loss over the course of the second quarter.

Due to Vivint's business model and the HLBV method, the allocation of income (a net loss in each quarter during the relevant period) between shareholders and NCIs may vary substantially from one quarter to the next depending upon (1) contributions by investors and (2) transfers of title to the funds that provided the requisite capital. For example, if a fund provided capital to Vivint but did not receive title to the systems until after the quarter ended, HLBV would show a loss being allocated to NCIs. If title were transferred before the quarter ended, however, the loss would be allocated to shareholders. Because the income allocated to NCIs was a net loss during every quarter, subtracting NCI income from Vivint's overall income had the effect of recognizing increased

income to shareholders. NCI losses were occasionally larger than the amount lost by the company as a whole, resulting in the recognition of a net positive amount of income to shareholders.

In 2014, Vivint sought capital on the public equity markets. On October 1, 2014, Vivint issued the IPO at issue on appeal, in which it sold 20,600,000 shares of common stock at $16 per share, raising $300.8 million in net proceeds. In the accompanying registration statement, Vivint disclosed financial results for the six quarters immediately preceding the third quarter of 2014. These results revealed ever increasing overall net losses and fluctuating NCI losses, income available to shareholders, and earnings-per-share. Vivint also warned of the impact its business model and accounting practices could have on the allocation of income between NCIs and shareholders. The registration statement identified certain "key operating metrics" for assessing the company's performance: (1) system installations, (2) megawatts and cumulative megawatts installed, (3) estimated nominal contract payments remaining, and (4) estimated retained value. Vivint also identified Hawaii as a target for expansion while warning that changes in regulatory limitations, particularly in concentrated markets such as Hawaii, could hinder the company's growth.

On November 10, 2014, Vivint issued a press release that disclosed its financial results for the quarter ending September 30,

2014, the day before the October 1 IPO. The net loss attributable to NCIs decreased from negative $45 million in the second quarter to negative $16.4 million in the third—a decrease of $28.6 million. This change contributed substantially to a decrease in net income for shareholders, from positive $5.5 million in the second quarter to *negative* $35.3 million—a decline of $40.8 million. Earnings-per-share fell from $0.07 per share to negative $0.45, resulting in Vivint missing analyst projections by 143%.

The press release reported, however, that Vivint's third quarter 2014 results surpassed analyst expectations as measured by the "key operating metrics" referred to above: (1) 6,935 new installations, up 137% year-over-year; (2) 49 megawatts installed, up 196% year-over-year; (3) remaining contract payments from customers increased by $195 million, up 175% year-over-year; and (4) estimated retained value increased by $89 million, up 172% year-over-year. The company's overall market share also increased from approximately 9% in the first quarter to 16% in the third quarter.

On November 12, forty-three days after the IPO, Vivint released its Form 10-Q for the third quarter of 2014. The company specified that the "the decrease in net loss attributable to [NCIs] was primarily due to the timing of our sale and subsequent installation of solar energy systems into certain investment funds." J.A. 96. The 10-Q also revealed that Vivint's solar installations in Hawaii had

decreased from 15% of Vivint's total installations as of June 30, 2014 to 12% as of September 30, 2014.

From November 10 to November 11, 2014, the price of Vivint's stock declined from $14.74 to $11.42 per share, a decrease of approximately 22.5%. On November 13, 2014, the day following the release of the 10-Q, Vivint's stock declined to $11.70 per share from $12.33 per share on November 12, a decrease of approximately 5%.

On February 13, 2015, Stadnick filed the first amended complaint alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77l(a), and 77o(a), which was later superseded by a second consolidated amended complaint substantially repeating the allegations. On December 10, 2015, the district court granted the defendants' motion to dismiss the complaint for failure to state a claim. Stadnick timely filed this appeal challenging the dismissal of his claims under Sections 11 and 15.

## DISCUSSION

We review *de novo* a district court's dismissal for failure to state a claim under Rule 12(b)(6), "accepting all factual allegations as true, but 'giving no effect to legal conclusions couched as factual allegations.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d

Cir. 2010) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007)).[2]

On appeal, Stadnick argues that the district court erred in determining that the second amended complaint failed to state a claim under Section 11 when it alleged that Vivint failed to disclose, first, the financial information from the third quarter of 2014 and, second, the material adverse effect on its business of the evolving regulatory regime in Hawaii. Stadnick further argues that, because his Section 11 claims were improperly dismissed, so too were his claims under Section 15. We address each of these arguments in turn.

Section 11 of the Securities Act of 1933 imposes liability on an issuer of a registration statement in three circumstances: if (1) the statement "contained an untrue statement of a material fact," (2) the statement "omitted to state a material fact required to be stated therein," or (3) the omitted information was "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011) (specifying the bases for liability under Section 11).

---

[2] The parties also dispute whether Stadnick's allegations are premised on fraud and therefore must satisfy the heightened particularity requirements of Federal Rule of Civil Procedure 9(b). *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). We decline to address this issue because Stadnick's claims fail even under the more lenient pleading standard of Federal Rule of Civil Procedure 8(a).

## I.   The Third Quarter 2014 Interim Information

Stadnick alleges that Vivint violated Section 11 in failing to disclose the 2014 third quarter financial information in its registration statement, which was issued the day after the third quarter ended. Stadnick concedes, as he must, that Vivint did not violate SEC Regulation S-X, which requires only that a registration statement include financial statements that are more than 135 days old. 17 C.F.R. § 210.3-12(a), (g). But he argues that omitting the financial information as alleged here rendered the information that Vivint did disclose misleading. His argument, in substance, is that Vivint's third quarter performance, measured by income available to shareholders and earnings-per-share, should have been disclosed because it was an "extreme departure" from previous performance, under the test articulated by the First Circuit in *Shaw v. Digital Equipment Corp.*, 82 F.3d at 1210.

In the Second Circuit, the long-standing test for assessing the materiality of an omission of interim financial information has been that set forth in *DeMaria v. Andersen*, where we held that a duty to disclose such information arises if a reasonable investor would view the omission as "significantly alter[ing] the 'total mix' of information made available." 318 F.3d at 180 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). We have carefully considered *Shaw*'s "extreme departure" test and decline to adopt it.

The defendant in *Shaw*, Digital Equipment, prepared its registration statement on SEC Form S-3, which required disclosure of "any and all material changes." 82 F.3d at 1205 (emphasis omitted). The successful offering of preferred shares in *Shaw* commenced eleven days, and closed four days, before the end of the third quarter. *Id.* at 1200. Two weeks after the third quarter's close, the company announced an operating loss of $183 million for the quarter, far greater than analysts had expected. *Id.* The price of the common and preferred stock dropped approximately 20% below the IPO offering price. *Id.*

The *Shaw* plaintiffs alleged that, as of the date of the IPO, the defendants knew that the company's third quarter performance would be substantially worse than that of previous quarters and yet failed to disclose it. *Id.* at 1206. Accepting the factual allegations as true, the First Circuit concluded that Digital Equipment possessed, at the time of the IPO, interim information that created a "substantial likelihood" that Digital's performance during the quarter in question would represent an "extreme departure" from its previous performance. *Id.* at 1211. The operating loss was therefore material to the offering and disclosure was required. *Id*.

**A.** *DeMaria v. Andersen*

As noted above, in assessing whether an omission of interim financial information violated Section 11, the test in this Circuit has

been that set forth in *DeMaria*. There, plaintiffs claimed that the registration statement was materially false and misleading because the defendant corporation, ILife, failed to include financial information for the first quarter of 1999. *DeMaria*, 318 F.3d at 173. On May 24, eleven days after the IPO, ILife announced its first quarter results, indicating that it had suffered a $6 million loss while generating revenue of $2.2 million. *Id.* Three days later, the price of the company's stock had declined to $8.19, and the stock was trading at approximately $0.67 by August. *Id.* Plaintiffs alleged a violation of the third prong of Section 11: the omitted information was necessary to make the publicly available information not misleading. *Id.* at 178.

In assessing whether the omission violated Section 11, we applied the traditional materiality test long employed by courts, including the Supreme Court, in the omission context: "whether there is 'a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* at 180 (alteration in original) (quoting *TSC*, 426 U.S. at 449); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 44 (2011). We concluded that the omission did not violate Section 11 because, *inter alia*, the company had disclosed its losses for every quarter through the end of 1998 and had warned that it expected to

continue sustaining substantial losses. *Id.* at 181-82. The omission, therefore, would not have caused the registration statement to mislead a reasonable investor.

## B. *DeMaria* Remains the Operative Test in This Circuit

The district court, in dismissing Stadnick's claim, applied the "extreme departure" test of *Shaw*. We use this occasion to re-affirm that the "extreme departure" test is not the operative test in this Circuit. The operative test remains that set forth in *DeMaria*.

Stadnick accurately notes that we have relied upon *Shaw* in the past. Although we have relied upon some aspects of *Shaw*, the cases Stadnick cites lend no support to the proposition that we adopted the "extreme departure" test. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 & n.5 (2d Cir. 2015) (citing *Shaw* in finding that statutes and regulations can give rise to disclosure obligations); *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (citing *Shaw* for the proposition that courts must consider statements and omissions in context); *In re Morgan Stanley*, 592 F.3d at 360 n.8 (citing *Shaw* to demonstrate differences between Sections 11 and 12 of the Securities Act of 1933); *Rombach v. Chang*, 355 F.3d

164, 170 n.5 (2d Cir. 2004) (citing *Shaw* for the notion that the Rule 9(b) pleading standard applies to allegations sounding in fraud).[3]

There is good reason not to adopt the "extreme departure" test when assessing the materiality of a registration statement's omissions. First, *DeMaria* rests upon the classic materiality standard in the omission context, with which we and most other courts are familiar. Second, upon close examination, *Shaw*'s "extreme departure" test leaves too many open questions, such as: the degree of change necessary for an "extreme departure"; which metrics courts should look to in assessing whether such a departure has occurred; and the precise role of the familiar "objectively reasonable investor" in assessing whether a departure is extreme. And third, in some situations the "extreme departure" test can be analytically counterproductive.

This very case illustrates the unsoundness of the "extreme departure" test. Stadnick argues that changes in two metrics—income available to shareholders and earnings-per-share—over just three quarters represent an "extreme departure." To be sure, these traditional metrics, standing alone, lend support to Stadnick's claim. But the two metrics identified by Stadnick are not fair indicators of

---

[3] The same holds true as to Stadnick's claim that other circuits utilize *Shaw*'s "extreme departure" test. In every case he cites, the court similarly relied upon *Shaw* for other aspects of that opinion. *See Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 242 (6th Cir. 2015); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005).

Vivint's performance. Their fluctuation is attributable to the normal operation of the company's business model, in which the allocation of income, as determined by HLBV, is subject to the vagaries of the timing of transactions between Vivint and the NCI funds. The "extreme departure" test makes little sense in this context and confuses the analysis, while the *DeMaria* test, which examines omissions in the context of the total mix of available investor information, does not.

**C.** *DeMaria* **Did Not Require Vivint to Disclose its Third Quarter Interim Information**

Stadnick has failed to satisfy the test articulated in *DeMaria* because a reasonable investor would not have viewed Vivint's omission as "significantly alter[ing] the 'total mix' of information made available." *DeMaria*, 318 F.3d at 180 (quoting *TSC*, 426 U.S. at 449). Stadnick's view is too myopic, both temporally and with regard to the number of relevant metrics. The materiality of an omission must be assessed in light of the total mix of information in the public domain. For Vivint's registration statement, therefore, we assess the materiality of the omissions by taking into account: (1) the performance of all five metrics disclosed by Vivint (2) from the first quarter of 2013 through the second of 2014 and (3) the disclosures regarding Vivint's unique business plan and the HLBV accounting

method. When viewed in this context, it is plain that the omissions relating to income and earnings-per-share for the third quarter of 2014 did not render the publicly available information misleading.[4]

Stadnick focuses solely on income available to shareholders and earnings-per-share. A more accurate indicator of the company's performance, however, is Vivint's *total* revenue and *total* income (available to both shareholders and NCIs), neither of which are affected by the HLBV method. Prior to the third quarter of 2014, during every quarter but one, the company's total revenue increased from the previous quarter, and in every single quarter its net losses became larger, which comported with the successful implementation of its business model. Both of these trends continued through the third quarter of 2014.

It is clear, moreover, that the omission was not material even according to the variables identified by Stadnick if we examine them over the entire period for which Vivint disclosed information. Stadnick accurately notes that income available to shareholders and earnings-per-share decreased sharply from the second through the third quarter of 2014. But this was consistent with a pattern of fluctuation that began with the first quarter of 2013. Not only was the fluctuation substantial but, prior to the third quarter of 2014,

---

[4] We reproduce in the Appendix a chart from the defendants' brief detailing the pertinent metrics, displayed, except for per-share data, in thousands of dollars, that Vivint disclosed in its registration statement and in subsequent filings.

neither variable fluctuated in the same direction for two successive quarters; in other words there was never a trend of the shareholders' income increasing or decreasing. A reasonable investor, therefore, would not have harbored any solid expectations based on prior performance as to Vivint's third quarter 2014 performance as measured by the two metrics identified by Stadnick.

Also, and critically, Vivint's registration statement contained ample warnings and disclosures that explained shareholder revenue and earning fluctuations, namely that: (1) the peculiarities of its business model and the HLBV method render the metrics identified by Stadnick less probative of Vivint's performance; (2) as a result, the income available for shareholders would likely fluctuate from quarter to quarter; and (3) Vivint anticipated its substantial operating losses to continue.

Finally, we are persuaded that a reasonable investor would not consider the omission of the third-quarter results to be material in light of Vivint's self-described "key operating metrics." Each of them increased substantially from the second quarter of 2014 to the third and had more than doubled since the second quarter of 2013.

## II.   Evolving Regulatory Regime in Hawaii

Stadnick tacks onto his complaint an allegation that Vivint violated Section 11 by failing to adequately warn prospective

shareholders of the evolving regulatory regime in Hawaii, in violation of an affirmative duty of disclosure imposed by Item 303 of Regulation S-K.

In relevant part, Item 303 of Regulation S-K requires the disclosure of "any known trends . . . the registrant reasonably expects will have a material . . . impact on net sales or revenues or income." 17 C.F.R. § 229.303(a)(3)(ii). Disclosure is required where the trend is both (1) known to management and (2) "reasonably likely to have material effects on the registrant's financial condition or results of operations." *Litwin*, 634 F.3d at 716 (citation omitted).

Stadnick's argument is unavailing because (1) he has failed to allege that Vivint's operations in Hawaii were negatively affected by the regulatory changes and (2) Vivint's registration statement included ample warning that its business could be affected by evolving regulatory regimes, and named Hawaii in particular.

Stadnick focuses on the fact that, from the second to the fourth quarters of 2014, installations in Hawaii comprised a smaller portion of Vivint's total installations. Stadnick does not allege, however, that this decline was material to Vivint's revenue or operations. He has not alleged, for instance, that the actual number of installations in Hawaii decreased or even increased at a slower pace. Given the rapid increase in Vivint's total installations during this period, as reported in both the prospectus and the press release regarding the

third quarter 2014 results, it would not be unreasonable to infer that the number of installations simply increased at a greater rate in geographic regions other than Hawaii. There is thus no basis to disturb the district court's conclusion that the percentage drop in Hawaii was not a material fact that needed to be disclosed.

Stadnick's claim also fails because Vivint's registration statement included repeated warnings that its business was generally vulnerable to changing regulations, and particularly so in Hawaii. We thus find no basis for holding that Vivint failed to fulfill its affirmative disclosure obligation under Item 303 of Regulation S-K regarding the evolving regulatory regime in Hawaii.

**III.    Stadnick's Section 15 Claims**

Because we affirm the district court's dismissal of Stadnick's Section 11 claims, we also affirm the dismissal of his claims under Section 15. *See In re Morgan Stanley*, 592 F.3d at 358.

**CONCLUSION**

For the reasons stated above, we AFFIRM the judgment of the district court.

# APPENDIX

# Vivint Quarterly Results

**Displayed in Thousands of Dollars, Except Per Share Data**

|  | 1Q13 | 2Q13 | 3Q13 | 4Q13 | 1Q14 | 2Q14 | 3Q14 | 4Q14 | 1Q15 |
|---|---|---|---|---|---|---|---|---|---|
| **Total Revenue** | 592 | 1,333 | 2,274 | 1,971 | 3,507 | 6,558 | 8,333 | 6,860 | 9,545 |
| **Net Loss** | (10,780) | (11,961) | (14,993) | (18,736) | (36,543) | (39,611) | (51,693) | (38,072) | (59,975) |
| **NCI Loss** | (2,121) | (186) | (37,848) | (21,953) | (43,584) | (45,104) | (16,415) | (31,933) | (72,124) |
| **Net Income Available to Shareholders** | (8,659) | (11,775) | 22,855 | 3,217 | 7,041 | 5,493 | (35,278) | (6,139) | 12,149 |
| **Earnings Per Share** | (0.12) | (0.16) | 0.30 | 0.04 | 0.09 | 0.07 | (0.45) | (0.06) | 0.11 |