In the Matter of Uxin Limited Securities Litigation, Plaintiff,

against
XXX, Defendant.


650427/2019

For Plaintiffs:
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue, 11th Fl.
New York, NY 10016
212-545-4600
For Defendants:
Skadden, Arps, Slate, Meagher & Flom
4 Times Square,
New York, NY 10036
212-735-2844


Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 003) 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 88, 89, 90, 91, 92, 93 were read on this motion to/for DISMISS
This is a putative securities class action, brought on behalf of all persons and entities that purchased American Depository Shares (ADSs) of Uxin Limited (Uxin) pursuant or traceable to Uxin's allegedly false and misleading registration statement and prospectus (the registration statement and prospectus, collectively, the Offering Documents) issued in connection with Uxin's June 27, 2018 initial public offering (IPO) (Consolidated Amend. Compl., NYSCEF Doc. No. 83). The Consolidated Amended Complaint (the Complaint) asserts strict liability and negligence claims under Sections 11, 12 and 15 of the Securities Act of 1933 (the 1933 Act) against Uxin, China's largest used car e-commerce platform, certain of its senior executives and directors, and the investment banks that acted as its underwriters in connection with the IPO.
The Complaint alleges that Uxin's Offering Documents violated the 1933 Act in two [*2]ways: (1) they were materially incomplete and misleading as they touted Uxin's existing business model and services without disclosing the fact that Uxin was about to discontinue providing some of those same services that it touted in its Offering Documents shortly after the IPO and (2) they contained incorrect financial information about Uxin's sales, assets and liabilities. For the reasons set forth below, and as discussed at oral argument (3/3/2020), the defendants' joint motion to dismiss is granted in part as set forth below.
Uxin's business is composed of two main segments: (i) Uxin Auction (the 2B Business), which primarily helps businesses such as car dealerships source vehicles, optimize turnover, and facilitate cross-regional transactions and (ii) Uxin Used Car (the 2C Business), which primarily provides consumers with customized car recommendations, financing, title transfer, delivery, insurance referral, warranty and other related services (NYSCEF Doc. No. 83, ¶¶ 2-4). The 2B Business can further be broken down into a "C2B" component, in which cars listed by consumers are purchased by dealers, and a "B2B" component, in which cars listed by dealers are purchased by other dealers (id., ¶ 7, 51). Uxin makes money from the fees it collects for its transaction and auto-loan facilitation services for all of these business segments (id., ¶ 5). According to the Complaint, in 2017, 48% of Uxin's revenue came from facilitating loans as part of its 2C Business, and 38% of its revenue came from facilitating transactions as part of its 2B and 2C Businesses (id.). Uxin's 2B transaction facilitation revenue was 26.6% of its total revenue (Prospectus, p. 90, NYSCEF Doc. No. 73).
The Prospectus explained these revenue sources in detail:
2C business
Our 2C business generates revenues from (i) transaction facilitation services, and (ii) loan facilitation services.
Transaction facilitation revenue. For each used car sold through our 2C business, we charge a transaction facilitation service fee that equals the higher of a certain percentage of the price of the car and a minimum fee. The transaction facilitation service fee is for services provided through our platform in connecting consumers with used car sellers, facilitating car sales to consumers and providing after-sale warranty. . . .
Loan facilitation revenue. We generate loan facilitation revenue primarily from the loan facilitation service fee we charge. For each consumer auto loan facilitated through our platform, we charge a loan facilitation service fee paid by the borrower at the beginning of the loan period. We charge service fees for loan facilitation services in connection with loans for both used cars and new cars. . . .
2B business
Our 2B business generates revenues from transaction facilitation services. We primarily charge the buyers a transaction facilitation service fee for connecting business buyers with used car sellers and facilitating car sales through our auction service as well as for the title transfer service that we provide. . . . (id., p. 96).
Under the heading "Risk Factors," the Prospectus also explained that, "[a]n investment in the ADSs involves significant risks," including "the following risks [which] could have a material and adverse effect on our business, financial condition and results of operations:"
Risks Related to Our Business and Industry

If we fail to provide a differentiated and superior customer experience, the size of our customer base and the number of transactions on our platform could decline, and our [*3]business would be materially and adversely affected(emphasis in original).
Providing a differentiated and superior used car transaction experience for our customers, including both consumers and businesses, is critical to our business.
Our ability to provide a high-quality customer experience depends on a number of factors, including:
• our ability to improve our existing service offerings and upgrade our platform;
• our ability to meet the diverse needs of our customers with ongoing innovation and new service offerings;
• our ability to maintain and improve operating efficiency and service quality of our offline networks and personnel;
• our ability to leverage technology and data to improve our services;
• our ability to adequately train and manage our employees; and
• our ability to effectively ensure the quality of services provided by our third-party service providers on our platform. 
We cannot guarantee that we can provide a differentiated and superior experience to our customers as our business continues to evolve. Our failure to do so would materially and adversely affect our business, financial condition and results of operations (emphasis added).
* * *
We provide and work with third parties to provide many services through our platform, such as car inspection services and warranty services, which are the key to earn customer trust. If we fail to maintaina high level of customer satisfaction or fail to properly manage our warranty and car inspection programs or other services, our business, financial condition and results of the operation would be adversely affected (emphasis added).
(id., pp. 16-17).
Pursuant to its IPO, Uxin sold 25,000,000 ADSs at a price of $9 each for a total of $205.1 million in net proceeds (Compl., ¶ 6, NYSCEF Doc. No. 83). Each ADS represents three shares of Uxin's Class A common stock (id.).
The 2B Business Change
The Complaint alleges that less than two months after its IPO, on August 22, 2018, Uxin released its second quarter earnings (the Q2 Press Release) for the period ending June 30, 2019 (NYSCEF Doc. No. 75), together with an announcement of an "abrupt change to its business model," as the company would "drastically shrink the scope of its much-touted 2B Business services" by ceasing to provide inspections and ancillary services to consumers," which the plaintiffs claim was a competitive advantage which differentiated Uxin in the marketplace and which allegedly conflicted with statements made by Uxin in its Offering Documents (id., ¶ 7). Specifically, per the Q2 Press Release, Uxin stated:

[W]e historically provided inspection and other complementary services that enabled consumers to sell used cars through our 2B business. Starting in the second half of 2018, we will take an alternative approach that connects these consumers with quality dealers on our platform without us providing inspection and other services directly. Due to this change to our service approach, we will no longer record the corresponding GMV, which has historically made an immaterial contribution to our overall business. Our B2B auction business remains unchanged. The e-commerce market for used cars is [*4]still in its infancy in China. We are excited about the tremendous opportunities ahead, and we will continue to optimize our model and provide more value-added services to our users.
(NYSCEF Doc. No. 75, p. 1 [emphasis added]).
In the two months since the IPO, Uxin's ADS price had already decreased by approximately half (NYSCEF Doc. No. 76 [Stock Price List June 27, 2018-September 9, 2019]). On August 22, 2018, the day of Uxin's Q2 Press Release, however, its stock price actually went up by approximately 6% (id.).
Thereafter, on November 20, 2018, Uxin issued a press release following its third quarter earnings for the period ending September 30, 2018 (the Q3 Press Release) (NYSCEF Doc. No. 77). The third quarter was the first quarter reflecting the new exclusion of C2B sales from the 2B Business (id.). According to the Q3 Press Release, Uxin's transaction volume associated with its 2B Business declined 8.5% year-over-year and the associated gross merchandise value (GMV) declined 14.8% year-over year following the company's decision to stop providing those services (Compl., ¶ 8, NYSCEF Doc. No. 83). The Complaint alleges that Uxin's "cash and cash equivalent position also materially declined during the first three quarters of 2018," to wit, Uxin reported $194 in cash and cash equivalents, but by September 30, 2018, Uxin's cash and cash equivalents fell to approximately $98.4 million (id., ¶ 9). However, as the defendants point out, because C2B sales were excluded from the 2B business, the year-over-year numbers were no longer "an apples-to-apples" comparison, and comparing the B2B Business alone — which now accounted for all of the 2B Business — Uxin actually achieved an 18% year-on-year growth in transaction volume and a 13.3% year-on-year growth in GMV (NYSCEF Doc. No. 77, p. 3). Accordingly, despite the exclusion of C2B sales, overall transaction facilitation revenue for Uxin's 2B Business was up 20.8% year-on-year to $27.8 million (id.). On the day of the Q3 Press Release, Uxin's ADS price closed at $4.50, which was a $0.60 drop from the day before (NYSCEF Doc. No. 76; Compl., ¶ 10, NYSCEF Doc. No. 83).
In December of 2018, Uxin's ADS price dropped even further, then spiked dramatically (going from $2.86 on December 4, 2018 to $9.35 on December 24, 2018) and then fell again by more than half to $3.88 by January 2, 2019 (NYSCEF Doc. No. 76). The Plaintiffs do not claim that the sharp decline at the end of December of 2018 was caused by any revelation of any prior misstatement or omission in Unix's Registration Statement. The instant complaint was initially filed on January 22, 2019, based solely on the post-IPO change to Unix's 2B Business that was announced pursuant to the Q2 Press Release on August 22, 2018.
On March 14, 2019, Uxin announced its fourth quarter 2018 and year-end financial results (the Q4 Press Release) (NYSCEF Doc. No. 79). Uxin stated that, "[t]he transaction volume for the 2B business decreased to 72,081 units in the fourth quarter of 2018 due to the Company's change of approach in serving consumers with car-selling needs as disclosed in the earnings release for the second quarter of 2018 as well as dealers' growing appetite for retail transactions through the Company's 2C platform" (id., p. 4). On the accompanying earnings call, Uxin's CEO explained that the shift was part of the company's plan and claimed that it actually created value for its business buyers, to wit:
 the 2B revenue and the transaction has declined. But I want to mention that it's on our plan. It's our strategy, because we found that the 2C business is very, very big and very potential the golden mine. So we  just to move all our resource and  into the 2C business. And that's also we're showing the result. We have very significant achievement [*5]in our 2C. And for the 2B business, I wanted to explain for the short term, medium term and the long term. For the short-term decline, especially in the Q4 and the last Q3, they are mainly due to we change our C2B business model.
(NYSCEF Doc. No. 80).
The plaintiffs assert that the full year 2018 results reflected bad news for Uxin investors:
Transaction volume for the 2B business decreased to 319,672 units in the full year 2018, representing year-on-year decline of 8.8%, due to the Company's change of approach in serving consumers with car-selling needs, as well as dealers' growing appetite for retail transactions through Uxin's 2C platform.
* * *
GMV for the 2B business decreased to RMB15,253 million in the full year 2018, representing year-on-year decline of 12.2%.
(Compl., ¶ 13, NYSCEF Doc. No. 83).
The plaintiffs complain that, in fact, "the Registration Statement did not disclose any information concerning the risk associated with and the effect on the Company (post-IPO) of no longer providing the ancillary services that differentiated it from competitors," i.e., the complimentary inspections, and that, "the Registration Statement did not disclose that the risk that dropping these services would result in a corresponding decrease in transactions on its 2B platform as well as a decrease in GMV and take rate for the 2B business," nor "explicate the magnitude that such a change would have on the Company's business, especially how business customers would react" (id., ¶ 16).
As such, the plaintiffs allege that the defendants are strictly liable for the purported misstatements and omissions contained in the Registration Statements and that the defendants have also violated their independent, affirmative duty to provide adequate disclosures
about known adverse conditions, trends, risk, and uncertainties about Uxin's business (id., ¶¶ 19-21).
The J Capital Report
On April 16, 2019, a short-seller entity called J Capital Research USA LLC (J Capital) issued a report (the J Capital Report) about Unix that claimed that the company has also grossly inflated its revenues, transaction volumes, car values, and inventories, and understated its debt load (id., ¶¶ 14-15).
Specifically, the J Capital Report provided the following summary conclusions:
• Overstated transaction volume: We believe that Uxin exaggerates the volume of auto sales processed by the company by as much as 40%.
• Undisclosed debt: Financial statements for Uxin's operating companies in China show a staggering level of debt that puts the company at risk of collapse. The debt has not been reported to U.S. investors.
• Fake values: The price of cars sold is artificially elevated to raise loan values, which are sometimes twice the actual value of the car. This means that the loan collateral is far below what's needed to cover defaults. We believe the elevated values have been used to obtain more debt than the company really needs, perhaps to enable insiders to take out cash. Management has pulled far more money out of the company than is justified by cash flows.
• Circular transactions: We have learned that Uxin's secret sauce for "revenue growth" is a special POS machine that embeds Uxin's proprietary software and routs unrelated [*6]transactions through Uxin accounts. Evidence suggests that Uxin is counting these third-party transactions as its own revenue. Uxin has provided transaction subsidies to induce dealers to use the POS.
• Overstated inventory: We had software built that shows the number of unique automobiles management says are available for sale is overstated by half. Even the more modest number of listings over-represents Uxin's inventory. We conducted more than 40 interviews with dealers, former Uxin executives, and salespeople from competing companies, and all concurred that Uxin is basically a Craigslist of autos, listing cars that are being offered on multiple websites. For free.
(id., ¶ 109).
The J Capital Report contains a "Terms of Service" provision, which among other terms of services, states:
You should assume that as of the publication date of our reports and research, J Capital Research USA LLC may benefit from short positions a client has in all stocks (and/or options, swaps, and other derivatives related to the stock) and bonds covered herein, and therefore stands to realize significant gains in the event that the price of either declines.
(NYSCEF Doc. No. 81).
On the day that the J Capital Report was released, Uxin ADSs closed at $1.95 per ADS (Compl., ¶¶ 14, 111, NYSCEF Doc. No. 83). As the Complaint acknowledges, Uxin has denied the allegations in the J Capital Report from the outset (id. ¶ 110). In fact, in a Form 6-K filing dated April 22, 2019 (Uxin Response Report), Uxin responded to each of J Capital's allegations in detail, claiming that the "the allegations in the Report are unfounded, and the Report contains numerous errors of fact, misleading speculations and malicious interpretations of events, and reflects a general misunderstanding of Uxin's business model and China's used car industry" (id.; NYSCEF Doc. No. 82).
Following the J Capital Report, the plaintiffs filed their consolidated amended complaint in this action. Now, based on the J Capital Report and the previously discussed Q2 Press Release, the plaintiffs claim that Uxin made materially false and misleading statements regarding its business, its operational and financial position, and its prospects in the Offering Documents because the Offering Documents allegedly omitted to state:
(1) that Uxin, which had emphasized in the Registration Statement the importance and quality of its 2B inspections due to the corresponding transparency and standardization across the Chinese used car market, was likely to stop providing those inspections for its business customers in the near future; (2) the extent of the risk that Uxin would change its business model to eliminate the highly-touted ancillary services; (3) the substantial effect that elimination of the ancillary services would have on Uxin's business and operating condition and prospects; (4) that, instead of providing the high quality inspections that it emphasized as an important part of its operations, Uxin would be changing its business model to merely connect consumers with third-party dealers who would provide such services at a potential loss of its touted transparency and standardization; (5) that, as a result of the change of the business model that it was emphasizing in its Registration Statement, the Company's 2B business would be materially adversely affected as shown through a significant reduction in GMV and transaction volume for the 2B business; (6) that Uxin's transaction revenues had been overstated by as much as 60%, because such revenues had improperly included revenues [*7]from third-party transactions that had simply been routed through Uxin accounts; (7) that Uxin had artificially inflated the price of cars sold on its platform, in some cases to twice the actual value of the car, including by replacing assessor-determined values with Company-determined ones and failing to conduct the claimed rigorous assessment of vehicles; (8) that Uxin had overstated its automobile listing inventory by as much as 50%, including by repeat-listing the same car in different cities and by listing automobiles that were unavailable or only available from other companies, including Uxin's competitors; (9) that Uxin had materially understated its existing debt load, including by not reporting the up to $3.6 billion debt of Uxin subsidiary Kai Feng; and (10) that, as a result of the foregoing, Defendants' statements in the Registration Statement regarding Uxin's business, operations, and prospects were materially false or misleading.
(Compl., ¶ 15, NYSCEF Doc. No. 83 [emphasis added]).
The Complaint asserts three causes of action for violations of (1) Section 11 of the 1933 Act (asserted against all defendants), (2) Section 12(a)(2) of the 1933 Act (asserted against all defendants), and (3) Section 15 (asserted against the individual defendants only).
DISCUSSION
The 1933 Act "protects investors by ensuring that companies issuing securities make a full and fair disclosure of information relevant to a public offering" (Omnicare, Inc. v Laborers Dist. Council Const. Indus., 135 S Ct 1318, 1323 [2015] [internal quotation and citation omitted]). The "linchpin" of the 1933 Act "is its registration requirement," which "must contain specified information about both the company itself and the security for sale" (Omnicare, 135 S Ct at 1323). Sections 11, 12, and 15 of the 1933 Act impose "strict liability for material misstatements contained in registered securities offerings" (NECA-IBEW Health & Welfare Fund, 693 F3d at 148). Claims asserted under the 1933 Act may be brought in state court (Cyan, Inc. v Beaver County. Emps. Retirement Fund, 138 S Ct 1061 [2018]).
I. A Heightened Pleading Standard Does Not Apply to Plaintiffs' Claims
The defendants argue that the plaintiffs' claims are subject to the heightened pleading requirements of CPLR 3016(b) because they are "based" upon alleged misrepresentations (e.g., Compl., ¶ 50[b]). CPLR 3016(b) states:
Where a cause of action or defense is based upon misrepresentations, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail
(CPLR 3016[b] [emphasis added]).
This however misses the point. Simply put, the claims here are based on an alleged breach of duty imposed under the 1933 Act. As this court has previously discussed, Congress enacted the 1933 Act and the Securities and Exchange Act of 1934 (the 1934 Act) to promote honest business practices in the securities market. The 1933 Act created private rights of action in connection with the initial public offering of securities and the 1934 Act regulates subsequent trading activity (Matter of Everquote, Inc. Sec. Litig., 65 Misc 3d 226 [Sup Ct NY Cnty 2019]). In Litwin v Blackstone Group, L.P. (634 F3d 706, 715 [2d Cir 2011]), and quoting Rombach v Chang (355 F3d 164, 171 [2d Cir 2004]), the Second Circuit explained that:
Fraud is not an element or a requisite to a claim under Section 11 and Section 12(a)(2). [A] plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2).
In other words, at their heart, Sections 11 and 12(a)(2) claims are negligence-based claims. And, a heightened pleading standard need not be satisfied because the defendant's state of mind is not relevant because scienter is not an element under Sections 11 and 12(a)(2) (i.e., as opposed to a claim based on fraud or otherwise under the 1934 Act) (In the Matter of Netshoes Sec. Litig., 64 Misc 3d 926 [Sup Ct NY Cnty 2019]). Based on the seminal case of Ultramares Corp. v Touche, 255 NY 170 (1931) and as distinguished from Glanzer v Shepard, 233 NY 236 (1922), generally, where the plaintiff alleges negligent misrepresentation, the plaintiffs must plead a special relationship approaching privity [FN1]
to establish a duty (see, e.g., J.A.O Acquisition Corp v Stavitsky, 8 NY3d 144, 148 [2007]; Parrott v Coopers & Lybrand, 718 NYS2d 709 [2000]; Credit Corp. v Andersen & Co., 65 NY2d 536 [1985]). But, where a plaintiff's claims arise under the 1933 Act, the statute (i.e., the 1933 Act) imposes the duty and that duty is to act truthfully in the offering of public securities. Put another way, the 1933 Act imposes a statutory duty which plaintiffs allege was breached by Uxin making materially misleading statements in connection with the offering of securities registered under the 1933 Act. The Complaint does not allege any claim for fraud or misrepresentation and only alleges claims based on negligence (NYSCEF Doc. No. 65, ¶¶ 1, 121). Therefore, and as the Litwin court observed, this is "an ordinary notice pleading case" (Litwin, supra, 634 F3d at 715), and, accordingly, the plaintiffs' claims brought in this court are not subject to a heightened pleading requirement that they would not be subject to in federal court.
II. The Complaint Fails to State a Claim Under Section 11 and 12(a)(2) of the 1933 Act with Respect to the B2 Business Change
Section 11 of the 1933 Act provides:
In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the facts stated therein not misleading, any person acquiring such security . . . [may] sue
(15 USC § 77k[a] [emphasis added]).
"Section 11 [] creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out" (Omnicare, 135 S Ct. at 1323). In either case, Section 11 imposes strict liability on issuers and signatories and negligence liability on underwriters (NECA-IBEW Health & Welfare Fund, 693 F3d at 156). As this court previously noted, whether a statement is materially false or misleading is viewed at the time such statement is made — not retroactively, in hindsight (In the Matter of Netshoes Sec. Litig., 64 Misc 3d 926).
Section 12(a)(2) imposes liability under similar circumstances against certain "statutory sellers" for misstatements or omissions in a prospectus (15 USC § 77l [a][2]).
As concerns the change to Uxin's 2B Business, the plaintiffs' allegations fail to state a [*8]claim because the post-IPO change simply did not retroactively render anything in the Offering Documents false or misleading and because the Complaint does not allege that the anything concerning the inspections and/or the B2 Business was known or should have been known to be false at the time of the IPO, and to the extent that the plaintiffs claim that the offering documents did not disclose that dropping these services would result in a corresponding decrease in transactions on its 2B platform or disclose the magnitude that such a change would have on the company's business, this claim is directly contradicted by the offering documents, which as described above, indicated that "[i]f we fail to maintaina high level of customer satisfaction or fail to properly manage our warranty and car inspection programs or other services, our business, financial condition and results of the operation would be adversely affected" (Prospectus, pp. 16-17, NYSCEF Doc. No. 73 [emphasis added]).
When asked at oral argument to identify any allegation concerning the defendants' knowledge about the change to the 2B Business at time of the IPO such that would make the offering documents misleading at the time of the IPO, counsel for the plaintiffs cited only to Paragraph 75 of the Complaint, which simply states:
75. One such glaring omission from the Registration Statement was that the Company would imminently and drastically shrink the scope of its much-touted 2B business services — a competitive advantage differentiating the Company in the marketplace — and cease providing inspections and ancillary services to consumers with car-selling needs who utilized the 2B service, which in turn would adversely affect the Company's GMV and transaction volume.
(NYSCEF Doc. No. 83).
Critically absent from Paragraph 75 and elsewhere in the Complaint, however, is any allegation that the defendants had any knowledge that "the Company would imminently and drastically shrink the scope of its much-touted 2B business services because the risk of change and its potential impact on the business was disclosed in the offering documents," i.e., that it was actually an omission.
A. Item 303
The plaintiffs additionally assert that Item 303 (Item 303)(17 CFR 229.303) required disclosure here. Item 303 imposes specific disclosure requirements on companies filing reports on SEC Forms 10-K and 10-Q (Indiana Pub. Retirement Sys. v SAIC, Inc., 818 F3d 85, 94 [2d Cir 2016] [internal quotation and citation omitted]). Pursuant to Item 303, Uxin was required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" (17 CFR 229.303[a][3][ii]; Stadnick v Vivint Solar, Inc., 861 F3d 31, 39 [2d Cir 2017]). However, a business strategy decision, such as the one made by Uxin concerning the change to its 2B Business, "is not the type of disclosure Item 303 requires" (Steamfitters Indus. Pension Fund v Endo Intl. PLC, 771 Fed Appx 494 [2d Cir 2019] [citing Stratte-McClure v Morgan Stanley, 776 F3d 94 [2d Cir 2015]). And, importantly, as discussed above, to the extent that the change in services and business strategy was a potential risk factor at the time of the IPO, as discussed above, the Prospectus disclosed that this was a material risk (NYSCEF Doc. No. 73, p. 16).
Most critically here, as discussed above, the Complaint simply fails to allege any facts showing that the defendants knew or should have known that Uxin was even exploring at the time of the IPO that Uxin would adjust its 2B Business afterthe IPO (see, San Leandro [*9]Emergency Med. Group Profit Sharing Plan v Phillip Morris Cos., Inc., 75 F3d 801 [2d Cir 1996] [rejecting claim that Phillip Morris had duty to disclose potential implementation of alternative pricing strategy to investors because such information did not render public information materially misleading]). Rather, the plaintiffs argue that Uxin touted its proprietary "300 check point" inspection service as a "key feature" and "critical foundation" of its business and ask this court to infer that any change in that strategy had (i) to be known at the time of the IPO and (ii) was material. "Securities laws do not impose a duty on corporate officials to be clairvoyant" (Shemian v Research in Motion Ltd., 2013 WL 1285779, *21 [SD NY Mar 29, 2013] [internal quotation and citation omitted], affd 570 F Appx 32 [2d Cir 2014]). Item 303 only requires the disclosure of "those trends, events, or uncertainties that [the registrant] actually knows of when it files the relevant report with the SEC" (Axar Master Fund Ltd. v Bedford 308 F Supp 3d 742, 759, n. 90 [SD NY 2018] [citation omitted]). Put another way, regardless of the actual impact the change may have had, plaintiffs do not allege any facts showing that the defendants knew of the change to Uxin's business or thought that it was reasonably likely at the time of the IPO to occur, or otherwise failed to disclose that the change would have a material effect on the business that was not disclosed in the offering materials such that the offering documents were actually misleading when made (In re Jumei Intl. Holding Ltd Sec. Litig., 2017 WL 95176, *4 [SD NY January 10, 2017]). On this point, In re Jumei is instructive. The plaintiffs in that case alleged that the registration statement was false and misleading because the company did not disclose its plans to exit the third-party beauty supplies marketplace, a disclosure the plaintiffs claimed was required under Item 303. Much as in the case at bar, the plaintiffs argued that it was simply inconceivable that the plan was hatched overnight due to its scope and impact on the company's business. As here, the complaint in that case set forth no actual facts to support the inference. The court dismissed the claim based on this alleged omission, and the same result is compelled here.
As the Second Circuit has explained, statements in offering materials simply reflect company policy at the time that they are made, and are "not promises to maintain that policy in the future" or "rendered misleading by the company's subsequent consideration of an alternative plan" (San Leandro Emergency Med. Grp. Profit Sharing Plan v Philip Morris Cos., 75 F3d 801, 811 [2d Cir. 1996]).
Likewise, the fact that the Offering Documents repeatedly referenced inspections as a unique and distinguishing characteristic contributing to Uxin's business success does not make these statements actionable. Statements of opinion are not actionable. As the U.S. Supreme Court has explained, "[a] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong" (Omnicare, Inc., supra, 135 S Ct at 1327). To be actionable, the opinion statements must be both (i) false and (ii) not honestly believed when made (Waterford Twp. Police & Fire Retirement Sys. v Regional Mgt Corp., 2016 WL 1261135, at *9 (SD NY 2016).
Similarly, accurate statements about past performance or expressions of puffery and corporate optimism are not actionable under the securities laws (Nadoff v Duane Reade, Inc., 107 F Appx 250, 252 [2d Cir 2004]). Accordingly, absent factual allegations demonstrating that any of such statements were false or misleading when made (and there are none in the Complaint), statements concerning the value of inspections and other consumer services to Uxin's business do not give rise to a securities claim where, as here, the offering documents indicate that a change to the manner in which the company differentiated itself (i.e., the manner [*10]in which the inspections were performed) could have a material adverse effect on its business. Accordingly, the claims in the Complaint that are based on the change to Uxin's B2 Business are dismissed without prejudice. 
III. The Complaint States a Claim Under Section 11 and 12(a)(2) of the 1933 Act with Respect to Uxin's Financial Documents
The defendants argue that the remaining allegations in the Complaint concerning Uxin's financial and operational data should also be dismissed because they are based on the report of a short seller, J Capital, and are, therefore, inherently unreliable. As Judge Scheindlin observed in In re Longtop Fin. Techs. Ltd. Sec. Litig.:
 short sellers operate by speculating that the price of a security will decrease. They can perform a useful function by bringing information that securities are overvalued to the market. However, they have an obvious motive to exaggerate the infirmities of the securities in which they speculate.
(910 F Supp 2d 561, 577 [SD NY 2012]).
In moving to dismiss the claims based on the J Capital Report, the defendants point out that, (i) Uxin has vigorously refuted the J Capital Report through its own Uxin Response Report (NYSCEF Doc. No. 82), as discussed infra, and (ii) that the company has not restated any of its financial documents, is evidence that the J Capital Report is unfounded.
In their opposition papers, the plaintiffs argue that, to the contrary, the J Capital Report's conclusions regarding Uxin's inflated sales volumes have actually been confirmed by Uxin's own later admissions, including (i) Uxin's April 29, 2019 Form 20-F, which disclosed for the first time that Uxin's reported 2C GMV included "certain free-of-charge intraregional transactions we facilitate..." (NYSCEF Doc. No. 90, p. 1), and (ii) Uxin's June 2019 Form 6 K, which disclosed that, beginning in the first quarter ended March 31, 2019, "Uxin will only disclose the transaction volume and the corresponding GMV for the transactions which generate revenues" (NYSCEF Doc. No. 99, Ex. 99.1, p. 1). As a result, the plaintiffs claim, Uxin's GMV and transaction volume declined precipitously. Using the revised measure, Uxin's first quarter 2019 2C transaction volume "increased to 78,227 units representing year-over-year growth of 39.6%," however, this meant that Uxin's actual2C transaction volume was only 56,035 units for the first quarter of 2018 — compared to 101,425 units disclosed in the Prospectus. The plaintiffs maintain that a similar shrinkage occurred in reported GMV and that nothing in the Prospectus disclosed that almost half of Uxin's supposed "transaction volume" produced zero revenue. Based on the foregoing, the plaintiffs claim that the information presented in the Offering Documents was materially misleading. As discussed below, at a minimum, this is sufficient to survive a motion to dismiss.
Federal courts in the Second Circuit have permitted securities claims to go forward at the pleading stage on the basis of short seller reports (see, e.g., McIntire v ChinaMediaExpress Holdings, Inc., 927 F Supp 2d 105, 124 [SD NY 2013]; In re: Longwei Petroleum Investment Holding Ltd. Sec. Litig., 2014 WL 285103, * 4 [SD NY January 27, 2014]). As Judge Baer noted in his decision in Longwei Petroleum, "'[t]he reliability of the [short seller's] report is a question of fact' that cannot be decided on a motion to dismiss" (id., citing Ho v Duoyuan Global Water, Inc., 887 F Supp 2d 547, 564 [SD NY 2012]).
The Southern District of New York's recent decision in Long Miao v Fanhua, Inc., which was raised by the defendants at oral argument, is not to the contrary (— F Supp 3d &mdash, 2020 WL 996602). Long Miao concerned fraud claims brought pursuant to the Securities Act of 1934, [*11]which, as discussed above, have a different applicable standard from the claims that are alleged here pursuant to the 1933 Act. In any event, the case simply does not stand for the proposition that allegations relying on a short seller's report are inherently unreliable and must be dismissed. To the contrary, in his decision, Judge Engelmayer acknowledges that, generally, federal courts have sustained complaints that rely on short-seller reports for their allegations "where independent factual allegations corroborate[ ] the factual allegations in the complaint drawn from short-sellers' reports" (id., pp. 35-36). In Harris v AmTrust Financial Services, the one case cited where the federal court ruled to the contrary and dismissed a complaint which relied "almost entirely on a negative report published by a short seller," the lead plaintiff conceded that the short seller's report may have been wrong in certain respects and was, in fact, "proven wrong in others by the passage of time" (135 F Supp3d 155, 159 [SD NY 2015]). The plaintiffs correctly argue that this is not the case here where Uxin's own subsequently filed documents (although not a "restatement" of any previously filed financials), suggest that the J Capital Report's claims about Uxin's inflated sales volumes were correct.
The fact that Uxin has refuted the J Capital Report through its own filing does not conclusively refute that Unix has inflated or misstated its financial and operational data. This simply raises a factual issue to be explored in discovery (see Sachsenberg v IRSA Inversiones y Representaciones Sociedad Anonima, 339 F Supp 169, 180 [SD NY 2018] [accepting short seller's report as a "sufficiently reliable factual source for Plaintiff's allegations"]). This is particularly the case in light of the fact that J Capital then issued a rebuttal report, dated April 24, 2019, to address Uxin's arguments and defenses, and where the plaintiffs — far from conceding any mistakes in the J Capital Report — maintain that the offering documents materially mislead investors by overstating business volume and understating liabilities (NYSCEF Doc. No. 92). Taking the allegations in the Complaint as true, as the court must, the motion to dismiss the Section 11 and 12(a)(2) claims based on the allegations that the offering documents misstated relevant financial information is denied.
IV. Section 15 Liability for Individual Officers and Directors
Section 15 of the 1933 Act "creates liability for individuals or entities that 'control [] any person liable' under section 11 or 12" of the Act and, thus, "relies in part on a plaintiff's ability to demonstrate primary liability under sections 11 and 12" (In re Morgan Stanley Info. Fund Sec. Litig., 592 F3d 347, 358 [2d Cir 2010]). As the court is not dismissing the Section 11 and 12 claims in their entirely, the plaintiffs' section 15 claims go forward. For the avoidance of doubt, to the extent that the individual defendants have not yet been served, the court need not address the Section 15 claims against these individual defendants at this time.
Accordingly, it is
ORDERED that the motion to dismiss is granted in part as set forth herein, and it is further
ORDERED that the defendants are directed to file an answer within 30 days of this decisions, and it is further
ORDERED that the parties appear for a preliminary conference in Part 53 on April 13, 2020 at 11:30 AM.
Dated: March 9, 2020
ANDREW BORROK, J.S.C.



Footnotes

Footnote 1:In Credit Corp. v Andersen & Co., 65 NY2d 536 [1985], the court explained that the doctrine of privity "is said to have its source in the classic enunciation of its rationale in Winterbottom v Wright (10 M W 109, 152 Eng Rep 402 [1842])" where the Court of Exchequer held that the defendant, who breached an agreement with the purchaser by failing to keep a mail coach in repair, was not liable to an injured party who was riding in the coach when it collapsed from latent defects because of lack of privity.