Filed 2/28/20; Certified for publication 3/23/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> NATERA INC. et al., <br><br> Defendants and Respondents. | A155613 <br><br> (San Mateo County Super. Ct. No. CIV537409) |

Plaintiffs filed a class action against Natera Inc. (Natera) and others under the Securities Act of 1933 (15 U.S.C. § 77a et seq.), alleging that the documents issued in connection with Natera's initial public offering omitted material facts that were required by regulations or necessary to make the documents not misleading. Plaintiffs' primary contention is that the documents, which became effective on July 1, 2015 improperly "tout[ed] [Natera] as 'rapidly growing,' amid a 'quarterly' revenue growth 'trend' with year-over-year revenue increases," while omitting Natera's "material negative financial results" for the second quarter of 2015. The second quarter had ended the day before, on June 30, 2015, and second quarter financial results had not yet been made public. The trial court granted defendants'

1

motion for judgment on the pleadings, judgment was entered for defendants, and plaintiffs now appeal.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Facts*

We draw our statement of the facts from the First Amended Consolidated Complaint (Amended Complaint), as well as documents that are quoted or referenced in the Complaint of which defendants asked the trial court to take judicial notice.[1]

1.    *The Parties*

Plaintiffs are the City of Warren Police and Fire Retirement system, which is an institutional investor, and individuals Mika Cahoj, M. Jim Ellis, and Van Nguyen, all of whom are suing on behalf of themselves and all others similarly situated.  Each plaintiff claims to have purchased shares of Natera common stock "pursuant and/or traceable to" the registration statement and prospectus (collectively, Registration Statement) issued in connection with Natera's July 1, 2015 initial public stock offering (IPO).

Natera is a genetic testing company that develops and commercializes noninvasive methods for analyzing DNA.  Its primary product is Panorama, a prenatal screening test (NIPT) for fetal chromosomal abnormalities that is based on a blood draw, rather than amniocentesis.  In addition to Natera, plaintiffs sued eight individual Natera officers and directors (the Natera Individuals) and five underwriters (the Underwriters).[2]  We refer to Natera, the Natera Individuals and the Underwriters collectively as "defendants."

---

[1] Specifically, we take judicial notice of excerpts from Natera's Registration Statement, its forms 8-K issued on July 24, 2015 and August 12, 2015, and the statements made therein.

[2] The Natera Individuals are Matthew Rabinowitz, Chief Executive Officer and Chairman of Natera; Jonathan Sheena, co-founder, Chief

2.      *The Natera IPO*

In May 2014, Natera filed with the Securities and Exchange Commission (SEC) a draft Registration Statement in anticipation of its IPO. On July 1, 2015, Natera filed the final amendment to the Registration Statement and the SEC declared the Registration Statement effective that same day.  The Registration Statement included financial data for the years ending December 31, 2013, 2014 and 2015, and for three-month periods from the quarter ending June 30, 2013 (2Q 2013) through 1Q 2015 (1Q 2015). Natera's stock was offered to the public on July 2, 2015.  Thus, although Natera completed its IPO two days after the June 30, 2015 close of the second quarter of 2015 (2Q 2015), the most recent financial results that were available to investors in the Registration Statement were from the first quarter of 2015, which closed March 31, 2015 (1Q 2015).  The essence of plaintiffs' complaint is their claim that interim results for 2Q 2015 should have been included in the Registration Statement.

The Prospectus Summary in the Registration Statement characterized Natera as a "rapidly growing" company.  It stated that Natera's revenues had grown from $4.3 million in 2010 to $159.3 million in 2014, with net losses decreasing from $37.1 million for the year ended December 31, 2013 to $5.2 million for the year ended December 31, 2014.  Natera attributed its "commercial success and future growth prospects" to "[e]xtensive expertise in both molecular biology and bioinformatics," "[b]est-in-class performance and coverage," "[i]ndependent sales force and global network of laboratory

Technology Officer, and director; Herm Rosenman, Chief Financial Officer and director; and Natera directors Roelof F. Botha, Todd Cozzens, Edward C. Driscoll, Jr., James I. Healey, and John Steuart.  The Underwriters are Morgan Stanley & Co. LLC; Cowen and Company, LLC; Piper Jaffray & Co.; Robert W. Baird & Co. Incorporated; and Wedbush Securities Inc.

3

partners," "[s]ubstantial intellectual property," "[c]loud-based distribution model," "[f]uture applications of our technology connected with prenatal testing," and "[f]uture applications of our technology beyond prenatal testing."

The Prospectus Summary also identified certain risk factors.  For example, Natera stated, "We derive most of our revenues from Panorama, and if our efforts to further increase the use and adoption of Panorama or to develop new products in the future do not succeed, our business will be harmed"; "We have incurred losses since our inception and we anticipate that we will continue to incur losses for the foreseeable future, which could harm our future business prospects"; "Our quarterly results may fluctuate significantly, which could adversely impact the value of our common stock"; and "If we are unable to expand third-party payer coverage and reimbursement for Panorama and our other tests, if third-party payers withdraw coverage or provide lower levels of reimbursement due to changing policies, billing complexities or other factors, or if we are required to refund any reimbursements already received, our revenues and results of operations would be adversely affected."

In the July 2, 2015 IPO, Natera sold 10.9 million shares of common stock to the public at $18 per share.  At the time this action was filed in February 2016, Natera stock was trading in the range of $6.50 to $7.00 per share.  Plaintiffs attribute the drop in share price to "information reflecting the materialization of significant risks misrepresented and omitted from the Registration Statement . . . and to the partial revelation of material facts previously omitted and misrepresented."

According to plaintiffs, the misrepresentations and omissions in the Registration Statement began to emerge on July 24, 2015, three weeks after

4

the IPO, when Natera announced preliminary financial guidance for 2015. Then, on August 12, 2015, Natera reported its financial results for 2Q 2015 and the first six months of 2015, and reiterated its full-year financial guidance. Natera reported revenues of $45.1 million in 2Q 2015 compared to $35.8 million in 2Q 2014, and loss from operations of $15.5 million in 2Q 2015 compared to $1.2 million in 2Q 2014.[3] Net loss for 2Q 2015 was $19.7 million, and net loss for the first six months of 2015 was $29.7 million.[4] Natera reported that its research and development and selling, general and administrative expenses for 2Q 2015 were $34.8 million, an increase from $18.0 million in 2Q 2014.[5] For the first six months of 2015, those costs were $63.7 million, an increase from $36.7 million in the first six months of 2014. Natera stated that the increase in the three- and six-month periods over the previous year "was driven by an increase in research and development and direct sales headcount," including a net addition of 218 employees and contractors from June 30, 2014 to June 30, 2015 "as we increased our focus on a direct sales model in the United States."

Plaintiffs allege that the Registration Statement was misleading in portraying Natera as "rapidly growing," because the decline in revenues and increase in expenses and net loss from 4Q 2014 to 1Q 2015 (which, according to plaintiffs, Natera "minimized as an aberration") were followed by further revenue declines and increases in expenses and losses in 2Q 2015, developments that were omitted from the Registration Statement. Plaintiffs

---

[3] 1Q 2015 revenues were $47.4 million and loss from operations was $6.3 million.

[4] Net loss for 1Q 2015 was $10.0 million. Net loss for 2Q 2014 was $0.5 million, and net loss for the first six months of 2014 was $9.6 million.

[5] In 1Q 2015 these expenses were $28.9 million.

allege that, "[g]iven Natera's 'cash basis' accounting, the simplicity and predictability of the costs and expenses that increased, as well [as] the auditor and underwriter due diligence concomitant with the IPO," defendants knew the 2Q 2015 results before the IPO and went forward with the IPO despite material misrepresentations and omissions in the Registration Statement.

B.    *Proceedings in the Trial Court*

Plaintiffs' Consolidated Complaint (Complaint) included three causes of action for violation of the Securities Act of 1933:  securities fraud against all defendants under Section 11 (15 U.S.C. § 77k) for issuing an inaccurate and misleading Registration Statement; unlawful solicitation against all defendants under Section 12 (15 U.S.C. § 77*l*(a)(2)); and control person liability against the Natera Individuals under Section 15 (15 U.S.C. § 77*o*).

The trial court sustained defendants' demurrer to the Section 11 cause of action with leave to amend, and sustained their demurrer to the Section 12 and 15 causes of action without leave to amend.

Plaintiffs filed a First Amended Consolidated Complaint (Amended Complaint) alleging their amended Section 11 cause of action.  In compliance with a trial court order, defendants responded to the Amended Complaint by filing answers and moving for judgment on the pleadings, instead of demurring.

The trial court granted defendants' motion, and judgment was subsequently entered for the defendants.

## DISCUSSION

On appeal, plaintiffs challenge the dismissal of their Section 11 and Section 15 causes of action as alleged in the Amended Complaint and Complaint, respectively.

A.      *Standard of Review*

"'A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action. (Code Civ. Proc., § 438, subd. (c)(3)(B)(ii).)  A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review.' (*Kapsimallis v. Allstate Ins. Co.* (2002) 104 Cal.App.4th 667, 672.)  'All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law . . . .' (*Ibid.*)  Courts may consider judicially noticeable matters in the motion as well.  (*Ibid.*)" (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777.)

B.      *Analysis*

1.      *Section 11 Cause of Action Against All Defendants*

Section 11 "imposes liability on an issuer of a registration statement in three circumstances:  if (1) the statement 'contained an untrue statement of a material fact,' (2) the statement 'omitted to state a material fact required to be stated therein,' or (3) the omitted information was 'necessary to make the statements therein not misleading.'  15 U.S.C. § 77k(a)." (*Stadnick v. Vivint Solar, Inc.* (2d Cir. 2017) 861 F.3d 31, 36 (*Stadnick*).)

As a general matter, there is strict liability under Section 11, and therefore plaintiffs need not plead or prove that the defendant acted with any intent to deceive or defraud.  (See *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund* (2015) 575 U.S. 175, 179, 192-193, fn. 11 (*Omnicare*).)  "[D]efendants may be liable for even innocent or negligent misstatements or omissions." (*In re Harmonic Inc. Securities Litigation* (N.D. Cal. 2001) 163 F.Supp.2d 1079, 1088.)

The plaintiffs here contend that they have stated a Section 11 cause of action under two alternative theories:  first, that the omission of interim

financial results from 2Q 2015 renders certain statements in the Registration Statement misleading; second, that the Registration Statement failed to disclose a known negative trend, in violation of Item 303 of SEC Regulations S-K (Item 303).  (17 C.F.R. § 229.303(a)(3)(ii).)  We consider these theories in turn.

a.  *Plaintiffs' Claim that Omission of 2Q 2015 Financial Results Made the Registration Statement Misleading*

Plaintiffs contend that the Registration Statement falsely states that Natera was "rapidly growing," and that its "rapid growth of revenues" was based on the success of Panorama, but omits to report that quarterly revenues declined from $47.4 million in 1Q 2015 to $45.1 million in 2Q 2015 while net losses increased from $10 million in 1Q 2015 to $19.6 million in 2Q 2015.  Plaintiffs argue that the failure to disclose the negative information about 2Q 2015 while portraying Natera as a "growth story" states a claim under Section 11; that defendants had a duty to disclose material interim financial results for 2Q 2015, even though the quarter ended just two days before the IPO was completed; and that by omitting information about the negative results of 2Q 2015 the Registration Statement misled investors by framing risks as possibilities when they had already occurred.

(i.)  *Legal Standard*

As a general matter, SEC regulations require a registration statement to include financial statements only if they are more than 135 days old.  (*Stadnick*, *supra*, 861 F.3d at p. 36, citing 17 C.F.R. § 210.3-12(a), (g).)  Further, SEC regulations give companies 45 days after the end of a quarter to report quarterly results (17 C.F.R. § 249.308a(a)(2).)  and do not generally require the disclosure of interim quarterly results.  Nevertheless, there is liability under Section 11 "when an issuer's failure to include a material fact has rendered a published statement misleading."  (*Omnicare*, *supra*, 575 U.S.

8

at p. 194.) Thus, to state a claim for relief under Section 11 for omission of 2Q 2015 results, plaintiffs must allege sufficient facts from which the court can infer that the omitted information is material, *and* that it renders a statement in the Registration Statement misleading. (*Id.* at p. 196; see also *Rubke v. Capitol Bancorp Ltd.* (9th Cir. 2009) 551 F.3d 1156, 1163 [Section 11 complaint must demonstrate that omission is misleading].)

To determine whether statements are misleading, we must read them "in the context of the whole document. [Citation.] And they should be judged based on 'the facts as they existed when the applicable registration statement became effective.' [Citation.] '[T]he central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the [investment].' [Citation.]" (*In re InterActiveCorp Securities Litigation* (S.D.N.Y. 2010) 695 F.Supp.2d 109, 117; see also *In re Restoration Robotics, Inc. Securities Litigation* (N.D. Cal. Oct. 18, 2019) __ F.Supp.3d ___ [2019 WL 5295059, *10].)

(ii.)    *Application*

In the context of the Registration Statement as a whole, there is nothing false or misleading about the statement that Natera is "rapidly growing" or the statement that its "rapid growth of revenues" was based on the success of Panorama.

The statement that Natera is "a rapidly growing diagnostics company" appears in an introductory paragraph that describes the company's history of launching new products, its intention to launch new products, its revenue growth from 2010 to 2014, and an increase in year-over-year revenue from 1Q 2014 to 1Q 2015.

The phrase "rapid growth of revenues" appears in a paragraph headed "Quarterly Trends" in the sentence, "In general, our rapid growth of revenues is attributed to reimbursement from increased volumes of our Panorama, Horizon and Anora tests," under a chart that shows quarterly results of operations from 2Q 2013 through 1Q 2015. The statement clearly refers to the historical growth of revenue from $11 million in 2Q 2013 to $47.4 million in 1Q 2015, and does not imply that the growth has been constant or will continue, especially since the chart shows clearly that revenues from 1Q 2015 were lower than 4Q 2015, and that net losses were greater.[6] Furthermore, just above the chart, the Registration Statement cautioned, "Historical results are not necessarily indicative of the results to be expected in future periods, and operating results for a quarterly period are not necessarily indicative of the operating results for a full year." A similar warning appeared at the end of the Quarterly Trends paragraph: "Our historical results should not be considered a reliable indicator of our future results of operations." Elsewhere, the Registration Statement cautions that Natera's quarterly results should not be relied upon as an indication of future performance.

Not only did the Registration Statement clearly state that revenues had declined from 4Q 2014 to 1Q 2015, it attributed that decline to two primary causes: decreased average reimbursement for Panorama due to a new billing code for NIPTs coming into effect in January 2015,[7] and delayed

---

[6] The chart shows that revenues decreased from 4Q 2014 ($49.9 million) to 1Q 2015 ($47.4 million).

[7] The Registration Statement explained the significance of the billing code issue in detail, "In the United States, the American Medical Association, or AMA, generally assigns specific billing codes for laboratory tests under a coding system known as Current Procedure Terminology, or CPT, which we

10

revenue recognition. Contrary to plaintiffs' contentions, the Registration Statement did not describe the 1Q 2015 revenue decline as an "aberration," "hiccup," or "anomaly." The Registration Statement included information indicating that the revenue decline could continue even if sales of Panorama increased or stayed the same. The Registration Statement reported that the full effect of the new January 2015 billing code, which reduced average reimbursement for the Panorama test, had likely not been felt since not all payers might implement it timely. The Registration Statement also warned that third-party payers "may decide not to reimburse for Panorama, . . . or may set the amounts of such reimbursements at prices that do not allow us to cover our expenses." The delay in revenue recognition was attributed to the

---

and our customers must use to bill and receive reimbursement for our diagnostic tests. Once the CPT code is established, CMS [Centers for Medicare and Medicaid Services] establishes payment levels and coverage rules under Medicare while private payers establish rates and coverage rules independently. [¶] We currently submit for reimbursement using CPT codes that we believe are appropriate for our testing, but there is a risk that these codes may be rejected or withdrawn or that payers will seek refunds of amounts that they claim were inappropriately billed to a specific CPT code. A new CPT code specific to NIPT came into effect in January 2015; however, not all payers may implement this code in a timely fashion, and reimbursement may be less that we have received in the past. We do not currently have specific CPT codes assigned for Panorama or microdeletions and there is a risk that we may not be able to obtain such codes, or if obtained, we may not be able to negotiate favorable rates for such codes, or be able to receive reimbursement for the average-risk NIPT patient population using such codes. [¶] We accordingly cannot guarantee that our current or any future tests will have a CPT code assigned. In addition, there can be no guarantees that government and commercial third-party payers will establish positive or adequate coverage policies for our tests or reimbursement rates for any CPT code we may use."

11

increase in Natera's direct sales force, which Natera planned to continue expanding.[8]

The Registration Statement also disclosed that sales of Panorama could very well decrease: Natera stated that it sought to increase the use and adoption of Panorama "in all pregnancy risk categories" including specifically average-risk pregnancies, while reporting that just days before the IPO two medical organizations issued guidelines stating that conventional screening methods, rather than NIPT, were the most appropriate choice for first-line screening for average risk pregnancies.[9]

And the Registration Statement included information about costs and losses, as well as revenues. Total cost and expenses increased each quarter from 2Q 2013 ($18.4 million) to 1Q 2015 ($53.7 million). In the "Quarterly Trends" paragraph, Natera reported that in most of the quarters presented "we added sales and marketing personnel to our direct sales channel and added laboratory operations, research and development and administrative personnel to support our growth." Elsewhere Natera stated, "as we ramp up our internal sales and marketing and research and development efforts, we

[8] The delay in revenue recognition was attributed to an increase in the percentage of tests distributed through Natera's direct sales force, as opposed to tests distributed by laboratory partners. Even though a test distributed through the direct sales force "resulted in a higher average payment per test," most of the tests so distributed "are billed to insurance payers," and the revenue from those tests was "predominantly recognized on a cash basis as price is not fixed and determinable and collection is not reasonably assured."

[9] The Registration Statement disclosed that the American College of Obstetricians and Gynecologists and the Society for Maternal Fetal Medicine had "issued new guidelines for NIPT on June 26, 2015, stating that conventional screening methods, rather than NIPT, remain the most appropriate choice for first-line screening for average-risk pregnancies."

12

expect to incur costs in advance of achieving the anticipated benefits of such efforts."

Over the quarterly periods for which Natera provided data in the Registration Statement, net losses and income ranged from a $10 million loss in 1Q 2015 to $3.7 million in income in 3Q 2014. The 1Q 2015 loss was the largest shown, contrasted with a $1.2 million gain in 4Q 2014.[10] Natera stated that it expected losses to increase as it "continue[d] to devote a substantial portion of our resources to efforts to increase adoption of, and reimbursement for, Panorama and our other products, improve these products, and research and develop future diagnostic solutions."

Accordingly, we conclude that plaintiffs fail to state a claim that the omission of 2Q 2015 financial results rendered statements in the Registration Statement false or misleading. Plaintiffs' arguments to the contrary, and the legal authority on which they rely, are not persuasive.

Plaintiffs argue that the Amended Complaint states a Section 11 cause of action that in omitting information about 2Q 2015 financial results the defendants falsely framed risk factors as "hypothetical" or as "possibilities" when the risks had already materialized. The allegedly hypothetical risk factors that plaintiffs identify are "flat-lined" sales of Panorama; declining prices and third-party reimbursement for Panorama; third-party payers refusing, reducing or delaying reimbursement for low-to average risk pregnancies; and the impact of the January 2015 billing code change.

Plaintiffs' argument is unconvincing, because the Registration Statement describes these risks specifically and in depth. (*Plevy v. Haggerty*

---

[10] The second largest loss was $9.6 million in 1Q 2014. Of the quarters reported, just one other showed a net gain: 3Q 2014, with a net gain of $3.7 million.

(1998) 38 F.Supp.2d 816, 832 [discussing cases including two Ninth Circuit decisions and concluding, "where a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies"].) Insofar as sales are concerned, the Registration Statement was clear that although product revenues had increased each quarter from 2Q 2013 through 4Q 2014, revenue growth from 3Q 2014 to 4Q 2014 was considerably smaller than the growth between any two previous quarters and product revenues had fallen from 4Q 2014 to 1Q 2015. The Registration Statement used positive, not conditional, language in warning that it expected that it would continue to incur losses for the foreseeable future and that it expected losses to increase in the future. Similarly, the Registration Statement stated unambiguously that most third-party payers would not reimburse for NIPT for average-risk patients and that although medical organizations had been supportive of NIPT in average-risk pregnancies, a new guideline stated that conventional screening methods, rather than NIPT, was the most appropriate first-line screening in average-risk pregnancies. The Registration Statement also stated that the cost of product revenues had increased from 4Q 2014 to 1Q 2015 as a result of "reduced average reimbursement" for Panorama tests as the result of new billing codes coming into effect in January 2015, and was clear that the full effect of the new coding may not have been felt because some payers might lag in implementing it.

Plaintiffs contend that their case is akin to *In re Ulta Salon, Cosmetics & Fragrance, Inc. Securities Litigation* (N.D. Ill. 2009) 604 F.Supp.2d 1188, 1191 (*Ulta Salon*), a trial court decision denying a motion to dismiss

14

securities class action claims arising from the IPO of a beauty supply retailer. The plaintiffs in *Ulta Salon* alleged that IPO documents omitted information about financial results for a quarter that was to end nine days after the IPO. (*Id.* at p. 1192.) They alleged that if the information had been provided, it would have shown that expenses and merchandise levels had risen sharply, contrary to the historical trends discussed in the IPO material. (*Ibid.*) But *Ulta Salon* is factually distinguishable. In *Ulta Salon*, unlike here, the trial court found that the IPO documents could "reasonably be read to suggest" that "favorable trends" with respect to expenses and merchandise inventory "were expected to continue." (*Id.* at p. 1196.) Here, the Registration Statement was clear that Natera's costs were expected to increase in advance of yielding any benefits, that losses were expected to increase and that there was no expectation that its developing sales force would be as effective as its representatives in the past, or that it could maintain or replicate former reimbursement arrangements with payers.[11]

Another case that plaintiffs claim to be analogous is *Shaw v. Digital Equipment Corp.* (1st Cir. 1996) 82 F.3d 1194, which involved a public offering made in a "streamlined registration form [Form S-3] available only to certain well-capitalized and widely followed issuers about which a significant amount of public information is available." (*Id.* at p. 1206.) The applicable regulations in *Shaw* required discussion of material changes in the issuer's affairs that had not yet been described in ordinarily quarterly filings. (*Ibid.*) In *Shaw*, the appellate court held that to state a claim under Section 11 that

---

[11] Defendants point out that *Ulta Salon* has been cited only seven times since it was decided: six times by the Northern District of Illinois when reciting the elements of a claim, and once by the Northern District of Indiana when declining to follow it.

a Form S-3 registration statement omitted a material fact required by regulations, it is enough to allege that defendants had possession of, and failed to disclose, interim quarterly financial results "indicating some substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends and uncertainties." (*Id.* at p. 1211.) *Shaw* is inapposite because the issue concerning the interim financials was not whether absence of the quarterly results made the prospectus misleading, but rather whether there was a regulatory requirement to disclose them. Here, however, plaintiffs point to no analogous regulatory requirement. Further, *Shaw's* "extreme departure" test for materiality has been disapproved by the Second Circuit, as explained in another case cited by plaintiffs. (*Stadnick*, *supra*, 861 F.3d at p. 36 ["We have carefully considered *Shaw's* 'extreme departure' test and decline to adopt it"].)

b.    *Plaintiffs' Claim that Defendants Violated Item 303*

Plaintiffs argue that as an alternative theory of liability under Section 11, their Amended Complaint adequately pleads the omission of required material facts by alleging that defendants violated Item 303, a regulation requiring the disclosure of "known trends or uncertainties" that the issuer of a registration statement "reasonably expects will have a material . . . unfavorable impact on . . . revenues or incomes from continuing operations." (17 C.F.R. § 229.303(a)(3)(ii).)

In an interpretive release regarding the disclosure required by Item 303, the SEC stated that management must make two assessments with respect to a known trend or known uncertainty. (Management's Discussion and Analysis of Financial Condition and Results of Operations, Release No. 33-6835 (May 24, 1989) 54 Fed. Reg., 22427-01, 22430.) First, is the trend or uncertainty "likely to come to fruition? If management determines that it is

16

not reasonably likely to occur, no disclosure is required." Second, if management cannot make the determination that the trend or uncertainty is not reasonably likely to occur, "it must evaluate objectively the consequences of the . . . trend . . . or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur." (*Ibid.*) Management's determinations "must be objectively reasonable, viewed as of the time the determination is made." (*Ibid.*)

Section 11 generally imposes strict liability. (*Omnicare, supra,* 575 U.S. at p. 193.) But because actual knowledge of omitted information is an essential element of a violation of Item 303 it is also an essential element of a Section 11 claim that is based on a violation of Item 303. (*Steckman v. Hart Brewing, Inc.* (9th Cir. 1998) 143 F.3d 1293, 1297 [Item 303 "mandates . . . knowledge of an adverse trend"]; see also *id.* at p. 1296 ["allegations which sufficiently state a claim under Item 303 also state a claim under section 11"].) The actual knowledge element of Item 303 "requires that a plaintiff plead, with specificity, facts establishing that the defendant had actual knowledge of the purported trend." (*Das v. Rio Tinto PLC* (S.D.N.Y. 2018) 332 F.Supp.3d 786, 811 (*Das*); see also *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.* (S.D.N.Y. Jan. 14, 2010) 2010 WL 148617, *9.)

Plaintiffs argue that the Amended Complaint adequately alleged that at the time of the IPO, defendants had knowledge of 2Q 2015 results, even if those results were only interim, and therefore knew that Natera's revenues had declined in 2Q 2015 for the second consecutive quarter, and knew that Natera's losses in 2Q 2015 would be greater than any quarter's previous losses. Plaintiffs contend that based on this knowledge, defendants were

17

aware of a negative trend concerning increases in costs and decreases in reimbursement, resulting in decreases in revenues, and increasing losses. Defendants, however, failed to inform investors of this trend, which by the time of the IPO was not only reasonably likely to have, but in fact already had and would continue to have, a material impact on Natera's results.

As an initial matter, we conclude that the Amended Complaint does not adequately allege defendants were aware of interim or final results for 2Q 2015 at the time of the IPO. The Amended Complaint is replete with general allegations statements about Natera's use of cash basis accounting and the customary interactions between a pre-IPO company and its auditors and underwriters. But plaintiffs fail to allege specific facts establishing that any of the defendants had actual knowledge of the 2Q 2015 financial results. Instead, plaintiffs state that defendants "would have known" or "knew *or* should have known" (italics added), or "knew *or* were reckless in not knowing" (italics added) 2Q 2015 financial results. General and conclusory allegations such as these do not suffice to plead actual knowledge. (See *Das*, *supra*, 332 F.Supp.3d at pp. 810-811 [Second Circuit "clarified that 'Item 303 requires the registrant only to disclose those trends, events, or uncertainties that it *actually knows* of when it files the relevant report with the SEC. It is not enough that it should have known[.]' (*Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (emphasis added)"].)

This matters little, however, because the Registration Statement itself refutes any argument that defendants failed to disclose the negative trend of declining reimbursements and revenues with increasing costs and losses. (See *Mosco v. Motricity, Inc.* (9th Cir. 2016) 649 Fed.Appx. 526, 528 [affirming dismissal of Section 11 and Item 303 claims where registration statement "disclosed the very trend that Plaintiffs claim [the company] hid

from the market"].)  As we discussed above, the Registration Statement discloses the trend in some depth, outlining and analyzing the decline in revenues from 4Q 2014 to 1Q 2015 while discussing the expectation of reduced reimbursements ("we anticipate our average reimbursement per test will decrease"), increased costs, and increasing losses in the future.  Contrary to plaintiffs' contention, the case before us is unlike *Stratte-McClure v. Morgan Stanley* (2d Cir. 2015) 776 F.3d 94, where the appellate court concluded that plaintiffs adequately alleged a breach of the obligations imposed by Item 303.  (*Id.* at p. 106.)  There, the required disclosures of market trends that could negatively affect the defendant "were generic, spread out over several different filings, and often unconnected to the company's financial position."  (*Id.* at p. 105.)  Here, the disclosures were specific and included within a single document, including in the section of the prospectus entitled "Management's Discussion and Analysis of *Financial Condition* and Results of Operations."  (Italics added.)

In sum, we conclude that plaintiffs fail to demonstrate any error in the trial court's dismissal of their Section 11 claim

2. *Section 15 Cause of Action Against the Natera Individuals*

Section 15 imposes joint and several liability for "[e]very person who . . . controls any person liable under [Section 11]."  (15 U.S.C. § *77o*(a).)  To state a claim under Section 15, a plaintiff must allege a primary violation of the securities laws (here, a violation of Section 11) and must further allege that the defendant exercised actual power or control over the primary violator.  (See *Howard v. Everex Systems, Inc.* (9th Cir. 2000) 228 F.3d 1057, 1065 [addressing control person liability under Section 20 of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)); the analysis is the same under

19

Section 15 of the Securities Act of 1933, as stated in *Hollinger v. Titan Capital Corp.* (9th Cir. 1990) 914 F.2d 1564, 1578].)

As we discussed above, plaintiffs' Amended Complaint fails to allege a violation of Section 11. The failure to allege the required primary violation of the securities laws is fatal to plaintiffs' Section 15 cause of action. Accordingly, we need not consider whether the Complaint adequately alleged that the Natera Individuals are control persons.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

_____
Miller, J.

We concur:


_____
Kline, P.J.


_____
Richman, J.


A155613, *City of Warren Police & Fire Retirement System, et al. v. Natera, Inc., et al.*

21

Filed 3/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM et al.,<br><br>       Plaintiffs and Appellants,<br><br>v.<br><br>NATERA INC. et al.,<br><br>       Defendants and Respondents. | A155613<br><br>(San Mateo County<br>Super. Ct. No. CIV537409)<br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

**BY THE COURT:**

The opinion in the above-entitled matter, filed on February 28, 2020, was not certified for publication in the Official Reports. For good cause, the requests for publication are granted.

Pursuant to California Rules of Court, rule 8.1105, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Dated: _____                    _____
                                                                             Kline, P.J.

Trial Court:  Superior Court of San Mateo County


Trial Judge:  Hon. Gerald J. Buchwald


Robbins Geller Rudman & Dowd LLP, Andrew S. Love, Daniel J. Pfefferbaum, Armen Zohrabian, Spencer A. Burkholz and James I. Jaconette for Plaintiffs and Appellants


Katten Muchin Rosenman LLP, Bruce G. Vanyo, Christina L. Costley for Defendants and Respondents


A155613, *City of Warren Police and Fire Retirement System, et al. v. Natera, Inc., et al.*